**James Edward POINTON, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 477S266.**

Supreme Court of Indiana.

Sept. 3, 1980.

John J. Davie, LaPorte, for appellant.

Theodore L. Sendak, Atty. Gen., Thomas D. Quigley, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

On October 14, 1976, appellant James Edward Pointon was convicted by jury in LaPorte Superior Court No. 2, of murder in the first degree, felony murder, and rape. He was sentenced to life imprisonment on each count of murder and twenty-one years imprisonment on the rape conviction. We note at the outset of our consideration of this appeal that this cause involves the homicide of one individual. Therefore, the trial court could not impose a sentence on both counts of murder. *Franks v. State*, (1975) 262 Ind. 649, 323 N.E.2d 221. We remand this cause with instructions to vacate the judgment and sentence for felony murder.

Appellant raises five issues for our consideration in this appeal, which are as follows: (1) the denial of his petition for discharge, based on the fact that he was an adjudged criminal sexual psychopath at the time of the commission of the crimes charged here; (2) the admission of a confession and the admission of items obtained as the fruits of that confession; (3) the admission of items found in a police search of appellant's automobile; (4) the giving of final instructions Numbers 20 and 21; and (5) the refusal of the court to give appellant's tendered final instructions Numbers 1 to 5.

The evidence showed that on July 22, 1974, Mary Ellen Doll was in the city of LaPorte, Indiana, en route to the home of her parents in Union Mills, Indiana. She called her parents to report to them that she was having automobile trouble. About fifteen minutes later she called her mother again and reported that a man helped her and that he would take her to meet her parents in Union Mills. Arrangements had been made for this man to take her to a certain point in the town of Union Mills. Her parents were to meet her there and take her on to their home. These calls were placed from a laundromat in LaPorte, Indiana, which was next door to a gasoline filling station. Mr. and Mrs. Roy Redman observed Miss Doll and a man they identified as the defendant-appellant, in the filling station looking under the hood of Miss Doll's car. It was apparent that there were severe leaks in the radiator. The Redmans helped appellant and Miss Doll push the car away from the pump area of the station since the station was closed at that time. Miss Doll and appellant then went to the laundromat and made the phone calls to her parents. She was seen in the laundromat, making the phone calls, by a woman who identified the appellant as the man with her at the time. Miss Doll had told the Redmans that appellant was going to take her home. Miss Doll's body was found early the next morning, July 23, 1974, in a newly cut wheat field in an area between LaPorte and Union Mills, Indiana. She had been killed by a shotgun blast to the head. She also had sustained a fractured jaw, which was not caused by the shotgun wound, and bruises on her arms, her left thigh, around her eyes, her breast, and the back of her upper right arm which also had gouge

marks. Sometime after six p. m., the preceding day she had had sexual intercourse, which had broken her hymen. A stone or pearl was missing from a ring on the finger of Miss Doll. Nearby tire tracks showed a fairly distinctive tread pattern. Straw was later found on the undercarriage of appellant's car, and wheat chaff was found in the car. The tread on the tires of appellant's car matched the impression of tires on the field. Blood smears were apparent inside the automobile. A black stone, which fit Miss Doll's ring, was found on the front seat of appellant's automobile by the police. On July 23, when appellant appeared for work, he had what appeared to be fresh superficial scratches on his upper left arm. Appellant gave the police verbal and written consent to search his automobile and his room at the County Home and later gave an oral confession, which was videotaped by the police and shown to the jury during the trial, and a written confession.

## I.

■ In 1965, defendant-appellant was charged in the LaPorte Circuit Court with the crime of rape. On December 28, of that year, he was adjudged a criminal sexual psychopathic person and committed to the custody of the Division of Mental Health of the State of Indiana for treatment and institutionalization until he recovered from such psychopathy. Appellant was committed to Beatty Memorial Hospital in Westville, Indiana, where he remained for a period of five years. He was paroled by the Department of Mental Health after five years, but his status as a criminal sexual psychopath was never changed by the court. Appellant now contends that since he was never adjudged to have recovered from being a criminal sexual psychopath, the State is now barred from prosecuting him for any sex-related crime.

The Indiana Legislature provided for the care and treatment of persons found to be criminal sexual psychopaths in Burns § 9–3401 through 3409 inclusive. Acts 1949 Ch. 124 p. 1–9, *Amended* Acts 1959, Ch. 356 § 1, 2, p. 955 by providing that a person found to be in such state be committed to a mental institution for treatment and, if possible,

cure, rather than suffer criminal penalty for his crime. Criminal sexual psychopathic person was defined as:

"Any person over the age of sixteen (16) years who is suffering from a mental disorder and is not insane or feeble minded which mental disorder is coupled with criminal propensities to the commission of sex offenses, is hereby declared to be a criminal sexual psychopathic person."

It was further provided in Burns § 9–3409 that:

"No person who is found in such original hearing to be a criminal sexual psychopathic person, and such finding having become final, may thereafter be tried or sentenced upon the offense with which he originally stood charged, or convicted, in the committing court at the time of the filing of the original petition."

These statutes were all repealed in 1971, and replaced by the Indiana Legislature by Indiana Code § 35–11–3.1–1 et seq., which deal with criminal sexual deviants and provide that prosecution is in no way barred by a previous determination of criminal sexual deviancy for crimes committed after such finding.

It was the finding of the trial court here that appellant's adjudged status as a criminal sexual psychopathic person in 1965 only exempted him for prosecution of the crime from which that finding arose, and that such status had no effect upon his prosecution for these acts committed in 1974. We find the trial court to be correct in its interpretation of this law. Appellant's being adjudged a criminal sexual psychopathic person in 1965 had no effect on his status in the charges of rape and murder before the court in this case in 1976. The trial court properly overruled appellant's Motion for discharge.

## II.

■ Appellant contends the trial court improperly denied his motion to suppress his videotaped confession on the grounds that it was given without counsel being present when he had previously told police he did not want to talk to them without

having a lawyer present. The evidence showed that appellant was arrested at the county home in LaPorte on July 23, by the sheriff and several other officers. At the time he was informed of his *Miranda* rights and indicated to the police officers that he understood his rights. He subsequently gave the police permission, both orally and in writing, to search his automobile and his room. His attitude was described as being cooperative and the encounter was without conflict. Appellant was then taken to the LaPorte Police Station and escorted to an interview room. Present in that room with the appellant was the sheriff of LaPorte County, Detective Thorp, Officer Reeder, and State Police Detective Cole. The appellant had indicated to the police officers present that he was willing to talk to them and give them a statement. Officer Reeder was in the process of setting up the video-tape equipment. The testimony was that everyone was friendly and that there was small talk going on between the appellant and the officers. The sheriff got the appellant a cup of coffee and then told him that he was under arrest. The sheriff also told him he wanted to get a statement from him, but before he did, the sheriff said he wanted to advise the appellant of his rights again. This he did, by using a standard LaPorte City Police waiver form that contained the advices and provision for waiver that are commonly called the *Miranda* warnings. The sheriff then showed the form to the appellant and let him read it. The appellant responded to the sheriff that he understood his rights and that he was willing to talk to them, but he wanted a lawyer before he did so. The police officers then withdrew from their attempt to talk to the appellant. Appellant was left in the interrogation room for about fifteen minutes before he was removed to a cell. Detectives Thorp and Reeder were with him in the interrogation room. Thorp talked to Pointon about religion and family relationships. He reportedly asked Pointon if he believed in God and the appellant responded to him, "Why do people do things?" The appellant told Officer Thorp that he did not want to talk in front of the sheriff, as he did not trust the sheriff because of past

dealings with him. No further discussion was had with the appellant. He was placed in the county jail at about 11:00 p. m. The appellant was given an opportunity to use the phone that evening, but refused, and made no calls.

A probable cause hearing was had in the LaPorte City Court the next morning and appellant was present for the hearing. Appellant was advised by the judge of the LaPorte City Court as to all of his constitutional rights, including his right to have a lawyer represent him, but he made no request to the court for appointment of counsel at that time. The next morning, at about 10:53 a. m., Officers Stefankiewicz and Cooper were with the appellant in the booking room where hair samples and palm prints of the appellant were taken. Officer Cooper took defendant into the wash room to help him wash the ink from his hands following the taking of his palm prints and engaged in casual conversation with the appellant. Cooper asked the appellant, "Are you related to Mike and Joe Pointon?" The appellant said, "Yes, Mike's my brother and Joe's my father. They aren't in any trouble are they?" Cooper told him they were not in trouble, that he just saw them at Les and Pearl's as they were winding up their day and he was starting his, and that they usually had beer and he drank coffee. The appellant then asked Officer Cooper, "Why do people do things that they don't know what they did them later for?" Cooper responded, "I don't know." Appellant then asked Cooper, "Can I talk to you? I've got something I would like to get off my chest. I couldn't talk to those guys last night, there were too many of them." Cooper told him that he could not talk to him until he conferred with the prosecutor and asked him if it would be proper. He stated to Pointon that he did not have to tell the police anything because he had a right to an attorney and that anything he had told them previous to that time could not be used against him in any way. He told Pointon that before he talked to him he would contact the prosecutor's office because he did not want the appellant to say anything until he had determined that the

appellant completely understood his rights. The appellant said to Cooper, "I understand that. Contact them. I want to talk to you, tell them I want to talk to you and Sergeant Brantley." While Cooper was out, calling the prosecuting attorney, Brantley came in and stated that the appellant looked at him in a way that gave the impression that he wanted to say something to him. Brantley then asked the appellant, "Is there something you want to tell me and the sheriff?" The appellant said, "No, I can't talk to the sheriff." Brantley said, "Do you want to talk to me and Sergeant Cooper?" The appellant said, "Yes, but not to the Sheriff." Officer Cooper contacted the deputy prosecuting attorney. He told them that the police could talk to the appellant at his request, only if they again informed him of his rights and determined that he was willing to do so without counsel being present, and if he understood that he had a right to have an attorney present if he wished. The appellant assured Officers Cooper and Brantley that he understood his rights, that he understood he had a right to a lawyer, but he wanted to get this off his chest and tell them about it and did not want a lawyer present. He told them the only reason he had stated he wanted a lawyer was that he did not want to talk to the Sheriff as he did not trust him. He said he fully understood his rights and was willing to make a statement to them. He drew maps for them showing where to find the gun used to kill Miss Doll and also where he had thrown Miss Doll's clothes and her purse. He was offered the opportunity to use the phone again before the statement was taken, but he stated he did not wish to use it. He stated he did not want a lawyer present and that no one had influenced him to change his mind and that he wanted to talk to them and give them this statement. As a result of the confession he gave to the police, they were able to recover the clothes and the gun used in the crimes.

Appellant properly states that the issue here is simply whether defendant voluntarily and intelligently waived his rights under *Miranda v. Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. In determining the issue of voluntariness, we look to the totality of circumstances surrounding the giving and taking of the statement to determine whether there was substantial probative evidence to support the trial court's finding when it denied the suppression motion. *Johnson v. State,* (1978) Ind., 380 N.E.2d 1236; *Murphy v. State,* (1977) Ind., 369 N.E.2d 411.

It is true that *Miranda* and subsequent opinions have stated that once the defendant requests assistance of counsel, questioning must cease and any statements obtained on the basis of police interrogation after that point would be inadmissible. It has equally been held, however, that statements of defendants that are volunteered and spontaneous and not in response to interrogation are admissible if it can be shown by the surrounding facts and circumstances that the defendant was willingly and voluntarily speaking to the police. *Johnson v. State,* (1978) Ind., 380 N.E.2d 1236; *Bugg v. State,* (1978) 267 Ind. 614, 372 N.E.2d 1156; *Kennedy v. State,* (1977) 267 Ind. 322, 370 N.E.2d 331; *Riddle v. State,* (1976) 264 Ind. 587, 348 N.E.2d 635; *Lockridge v. State,* (1975) 263 Ind. 678, 338 N.E.2d 275; *Jennings v. State,* (1973) 262 Ind. 476, 318 N.E.2d 358. The discussion Officer Cooper had with the appellant in the washroom did not consist of questions calculated to be interrogation of him about the crime. Officer Cooper had become acquainted with other persons bearing the name of Pointon and merely inquired of the appellant in casual conversation whether these people were related to him. The police had refrained from questioning Pointon concerning the incidents of the day before. Pointon then asked Cooper if he could talk to him and get some things off his mind. Cooper advised him he could talk to him only after he had conferred with the prosecuting attorney about the propriety of doing so and only after he was sure that the appellant understood his rights with reference to having an attorney. He indicated the same thing to Brantley and Brantley told him the same. After clearing it with the prosecuting attorney's office, the police advised the defendant at length and questioned him regarding his request for a lawyer the eve-

ning before. He assured them he wanted to talk to them, that he did not want a lawyer, and that he had said that only to avoid talking to the sheriff. Pointon indicated he understood his rights and was willingly and voluntarily waiving those rights. The trial court was accordingly justified in finding that the statements given by the appellant were admissible and were not in violation of the *Miranda* safeguards, since they were not the result of interrogation by the police. There was neither the atmosphere of the stationhouse that tended to oppress or intimidate the appellant, nor the overbearing insistence of interrogation of the police that removed appellant's statement from being one that was voluntarily, intelligently and freely given. There was thus no error in their admission at the trial.

### III.

■ Appellant's next allegation of error concerns the admission of items found in a search. After Mary Ellen Doll's body was found, the police launched an investigation to determine the identity of the perpetrator. Witnesses were found who had seen the man talking to Mary Ellen Doll and they furnished descriptions of him. A composite picture was made from the descriptions furnished and this picture was circulated and published on July 23, 1974. An informant identified the photo as being a picture of the appellant. Sheriff Nickel knew Pointon as a former prisoner in his jail. He examined an office file that he had on Pointon. Pictures of the appellant were obtained and were identified by other witnesses. It was then determined that defendant was residing and working at the county home in LaPorte. It was further determined from a Mrs. Croff, at the home, that defendant did have a shotgun and that he was absent from the home on July 22, 1974. Appellant's car was sitting at the home and police were able to see without entering it that the tires on the car matched the tire track at the murder scene and that straw, similar to the straw at the murder scene, was present. The police were aware that a black pearl setting was missing from a ring on Miss Doll's finger and also had determined that they had enough evidence to approach the defendant and to arrest him. The sheriff and other officers then entered the county home where they found the defendant in the kitchen. He was working at a food preparation table and was standing up. The sheriff told the defendant that he wanted to ask him some questions, that he was investigating a homicide and that he wanted to search Pointon's room and his car. He showed Pointon waiver forms and told him that he first wanted the defendant to be aware of his rights. He then gave the defendant his rights under the provisions of *Miranda, supra,* both orally and in writing, and asked the appellant if he understood those rights. Appellant indicated that he did and then orally gave the officers the right to search his automobile and his room. He signed waiver forms which stated that he understood his rights and was willingly allowing the officers to make the search. He accompanied the officers to his room and was very cooperative with them. When one of the officers indicated that the automobile was locked, Pointon provided his keys and pointed out to the officer the proper key to open the doors and keys to the trunk, as opposed to the ignition key on the ring. The search of the interior of appellant's car revealed the black pearl setting from Miss Doll's ring which rolled out from a fold in the seat. Officers were also able to determine that there was wheat chaff in the interior of the car as well as blood stains.

The issues raised by appellant involving the search and seizures of his automobile and his room were resolved by the U. S. Supreme Court in *Schneckloth v. Bustamonte,* (1973) 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. The Supreme Court held in that case that in a non-custodial situation, the Fourth and Fourteenth Amendments require the State to show that consent was given voluntarily and not as a result of express or implied coercion or duress. They further held that voluntariness is a fact to be determined from all the circumstances and the State need not show that the subject knew he could refuse to allow the search although such knowledge would be

one factor to be taken into account. They expressly rejected the position that consent could be voluntary only if the suspect had been informed of his right to refuse because violation of the Fourth Amendment, unlike violation of the Fifth Amendment, does not affect the fairness of the trial itself. The evidence is without conflict here, that appellant was first given all of his *Miranda* rights and warnings and indicated he understood them and was willing to waive them in cooperating with the police. It was proper to find that his consent to search was valid, even if we assume that appellant's contention is correct, that the presence of three officers confronting him put him in a position of being "in custody." Since the consent to search the automobile and the room was freely and voluntarily given without violation of any of appellant's constitutional rights, the fruits of that search were admissible into evidence. There is thus no error on this issue.

## IV.

During the trial, appellant offered into evidence Defendant's Exhibit B, which was the record of Pointon's commitment and residence at the Beatty Memorial Hospital during his confinement there as a criminal sexual psychopath from 1966 to 1970. The State objected to the admission of this Exhibit on the grounds that it was evidence tending to show the mental condition or insanity of the defendant and was not relevant to this cause, since there was no plea of insanity at the time of the commission of this act filed by the defendant and no such defense was raised. Defense agreed that the issue of insanity was not before the jury and indicated that this exhibit was not being presented for that purpose. The defendant argued for admission of the Exhibit on the basis that there was a question before the jury as to the admission and the weight to be given to the confession and the fruits derived from that confession. Defense admitted that admissibility of the exhibit was to be determined by the court and that that question could not be resolved by the jury. However, he claimed that the jury had a right to have evidence of the intelligence and mental condition of the defendant to be used by them in determining whether or not the defendant knowingly, intelligently, and voluntarily waived his constitutional rights. The defense argued that the jury had a right to know what, in fact, the intelligence level of the defendant was and what his mental insufficiencies were. The record shows, in the arguments before the court outside the presence of the jury that both parties agreed that the exhibit be shown to the jury for the limited purpose of their use in determining the credibility of the confession. It was also agreed by the parties that the State would be entitled to an instruction by the court to guide the jury in the limited purpose for which this exhibit was being admitted. The court did, then, give final instruction No. 20, which told the jury that they were to use this exhibit for the purpose of assisting them in deciding whether defendant's confession was voluntary and was to be believed. In other words, it was admitted to assist them in determining the weight and credibility they would attach to the defendant's statement. They were advised that the evidence was not to be considered as establishing or tending to establish the defense of not guilty by reason of insanity since that was not an issue in the case.

Defendant's objection to final instruction 20 is that it limited the jury's consideration only to the voluntariness of the confession and did not refer to the question of the voluntariness of the consent to search that the defendant had given to the police. It was the contention of the defendant that the jury had the right to hear all of the circumstances of the consent to search given by the defendant to determine whether or not that was voluntarily given, and therefor, whether or not the fruits of that search were competent evidence for them to use in deciding the case. It appears that the stipulation of the parties was that the admission of this exhibit was only for the purpose of their use in determining the voluntariness and willingness of the confession. The parties stipulated to this, and the court admitted it on that basis. On the other hand, it was not improper for the court to refuse to instruct

the jury that they had a right to consider whether or not the consent to search was voluntarily and willingly given because they did not have a right to determine this issue. In *Schneckloth v. Bustamonte, supra*, the court provided that the application of constitutional principles to searches is limited to the resolution of the question of whether the items seized should have been admitted into evidence. This question does not affect the probative value of those items. The State is correct in its assertion that the mere fact that a place was searched is not evidence at trial since it does not tend to prove or disprove a material fact. It is the object found in a search, or the fact perhaps that nothing was found, which has a bearing on a case. Whether or not the Fourth Amendment was violated in a search does not affect the probative value of the evidence obtained thereby. The resolution of the Fourth Amendment constitutional question is, then, relevant only to the issue of admissibility and not to weight and credibility and admissibility is, of course, a question for the court, not the jury, to determine. *Juskulski v. State*, (1934) 206 Ind. 503, 190 N.E. 423; *Gilman v. State*, (1979) Ind.App., 389 N.E.2d 327, 332. There is thus no error in this issue.

■ The Court's final instruction No. 21 was as follows:

"The Constitution of this State makes the jury the judges of the law as well as of the facts. But this does not mean that the jurors may wilfully and arbitrarily disregard the law nor that they may make and judge the law as they think it should be in any particular case. It means that jurors, under their oaths, should honestly, justly and impartially judge the law as it exists and as it is found upon the statutes of our State in each particular case. It does not mean that jurors may so judge the law in any case so as to make it null and void and of no force, but that they shall so judge the laws as to give them all a fair and honest interpretation to the end that each and every law in each case may be fairly and honestly enforced. Any other interpretation of the law would weaken the safeguards erected by society for its protec-

tion; for by non-enforcement of the law and its penalties in all criminal cases where it is shown by the evidence to have been violated, contempt for the law is bred among the very class that it is intended to restrain. The facts must be judged and found by the jury from a careful consideration of all the testimony given by the witnesses in the case; and, under your oaths, you have no right arbitrarily to disregard either the law or the facts in this case without just cause after a fair and impartial consideration of both."

Appellant objects to this instruction because it tells the jury that they are the exclusive judges of the law as found in the *statutes* and does not fully inform them they are judges of both the facts and the law as found, not only in the statutes, but the case law and constitutional law and further that they are advised to give careful consideration of the testimony given by the witnesses in the case and that they were not told they were to consider all of the facts from all of the evidence, including witness' exhibits, documents, etc., in the trial.

This instruction has been approved by this Court and our Court of Appeals in *Holliday v. State*, (1970) 254 Ind. 85, 257 N.E.2d 679; *Seay v. State*, (1976) Ind.App., 342 N.E.2d 879. This same question was also raised in *Bowen v. State*, (1920) 189 Ind. 644, 128 N.E. 926. We said in that case that though there was an inaccuracy in limiting the reference to the statutory law, it was not such an inaccuracy as to afford cause for reversing the judgment. We find the same to be true here. Further, there were other instructions given by the court which told the jury they were to consider the entire evidence and the weight of the testimony from the whole body of the evidence in making their determination. This language appeared in Instructions 6, 9, and 22. Instructions are to be read as a whole and we will so consider them in determination of this question. *Porter v. State*, (1979) Ind., 391 N.E.2d 801, 814; *Smith v. State*, (1979) Ind., 388 N.E.2d 484, 487. Each instruction cannot tell the jury every-

thing. If all of the instructions together inform the jury of the law relevant to the nature of the case and the facts involved in it, then the jury has been properly instructed. We therefore do not find the inadequacies pointed out by the defendant in this instruction to be reversible error even though the instruction was inaccurate in its limitation.

## V.

◼ Finally, appellant claims the court committed reversible error in refusing to give appellant's tendered instructions 1 through 5, inclusive, as tendered by him.

Appellant's instruction No. 1 read as follows:

"You are instructed that you may not find the defendant guilty based upon evidence that was obtained from the defendant by the authorities in violation of his constitutional rights under the constitutions of the United States or the State of Indiana."

The court gave defendants Instruction No. 2, but amended it by striking from it a provision which stated that in determining whether the confession was voluntarily made, the jury could take into consideration "whether the confession was obtained in violation of the constitutional rights of the defendant under the United States and the State of Indiana constitutions. Defendant's tendered Instruction No. 3 proposed to instruct the jury that in determining whether the stone found in appellant's automobile should be used by them as evidence, they should determine whether appellant's automobile was validly searched by the officers. It advised them that the weight and credibility of the fruits of the search should be weighed against the question of whether it was validly obtained by the officers pursuant to amendments to the United States and the Indiana constitutions. Defendant's tendered Instruction No. 4 was a recitation of the Fifth Amendment of the United States Constitution and defendant's tendered Instruction No. 5 was a recitation of the Fourth Amendment to the United States Constitution. It further provided that if the jury found that the search of defendant's automobile was conducted in

violation of this constitutional amendment, that they were permitted not to consider any evidence obtained as a result of that search.

Since all five of these instructions go to the same issue, we will consider them together. These instructions raise the question of the propriety of the court's refusal to give instructions which tell the jury that it is to determine whether the constitutions were violated when certain State's evidence was obtained, and permitted into evidence by the court. The question raised in these instructions goes to the admissibility of the evidence, and not to the weight and credibility of it. The court gave other instructions that sufficiently advised the jury that they were the triers of the facts and were to determine the weight and credibility to be given all the evidence, including the confession of the defendant. They were told that they had a right to consider all the facts and circumstances surrounding the giving of this statement, including whether or not the appellant had the advice of an attorney, to determine whether his statement was given voluntarily, and of his own free will, so that the credibility of it might be determined by them. Admissibility, however, is a question for the court and not the jury. *Randolph v. State,* (1954) 234 Ind. 57, 122 N.E.2d 860; *Juskulski v. State, supra; Gilman v. State, supra.* Admissibility of evidence alleged to have been seized illegally is within the sole province of the court to determine, and is not a factor to be considered by the jury in deciding the probative weight or value of that evidence. The same is true of a confession. Voluntariness affects the probative value as well as the admissibility of a confession and to the extent to which the weight and credibility of the confession may be diminished by involuntariness. It is a matter properly before the jury. *Schneckloth v. Bustamonte,* supra.

Except as it is related to the question of the voluntariness of a confession, the constitutionality of the method by which evidence was seized or confession was obtained, is strictly a consideration for the trial court in determining the admissibility of the confes-

sion or seized items. Because each of the five instructions here attempted to place before the jury matters which were not proper for the jury to consider, there was no error in refusing to give them. A court does not commit reversible error when it refuses to give instructions that improperly state the law or that are covered by other instructions. *Smith v. State*, (1979) Ind., 388 N.E.2d 484. To the extent that these instructions would advise the jury that they were to pass on the admissibility of the evidence rather than its weight or credibility, they were improper. The jury was properly instructed by the court as to what evidence they were to consider and what weight they were to give to it in determining whether or not the confession and the fruits obtained as a result of it were voluntarily and freely given by the appellant and in using all of these facts and circumstances to determine the weight and credibility to be given to that evidence.

We remand this cause with instructions to correct the sentence by vacating the judgment and sentence on felony murder. The judgment of the trial court is affirmed in all other respects.

GIVAN, C. J., and DeBRULER, HUNTER, and PRENTICE, JJ., concur.