David GENTRY, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 22A01–9206–CR–195.

Court of Appeals of Indiana,
First District.

Dec. 16, 1993.

Rehearing Denied Jan. 13, 1994.

Transfer Denied March 18, 1994.

Steven A. Gustafson, Fox & Cotner, New Albany, for appellant-defendant.

Pamela Carter, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

BAKER, Judge.

Today we decide whether a person who performs an act which causes the death of another person while the other person is suffering from the effects of an attempted suicide by other means commits murder. Appellant-defendant David Gentry appeals his conviction for Murder, a felony.[1]

### ISSUES

Gentry raises several issues for our review:

1. Whether he was improperly charged with murder.
2. Whether he had legal authority to cause his mother's death.
3. Whether his diaries and journals were improperly admitted into evidence.
4. Whether the trial court improperly instructed the jury on erroneous acquittal.
5. Whether Gentry received inadequate assistance of counsel.

### FACTS

Since 1989, Gentry has lived with his fifty-eight-year old mother, Nadine Gentry, in her house in New Albany, Indiana. Gentry helped care for Nadine who suffered from multiple sclerosis and a benign brain tumor and who was confined to a wheelchair or scooter.

---

1. IND.CODE 35–42–1–1 (1986).

When Gentry returned home from work on May 2, 1991, he found a "gone fishing" sign in his mother's handwriting in the front door to the house. Upon entering the house, Gentry peeked into the living room from the doorway and saw Nadine apparently asleep on the couch. Gentry did not enter the living room and eventually left the house around 6:15 p.m. to go to a Boy Scout meeting. When he returned home around 9:00 p.m., Gentry discovered Nadine still lying on the couch. This time Gentry asked his mother if she was alright. Nadine had difficulty speaking, but mumbled something that sounded like "hurt" and "leave."

Gentry discovered a note from his mother to him and Mr. Duvall on Nadine's scooter. The note was handwritten on the back of a photocopy of a newspaper article on euthanasia, the obituary of Nadine's late husband, and a photocopy consisting of Nadine's letter to the newspaper editor relating how weeks earlier she had told hospital officials to remove a mechanical ventilator which kept her husband alive. Nadine's note stated that Gentry and Duvall should not hastily throw away her things as they may be necessary and worthwhile to others and that this may insult the "self concept" of the many people who have been so kind to her but that she will be with her husband. Gentry assumed the note meant that Nadine was attempting to end her life.

After reading the note, Gentry checked the bathroom cabinet to see if a bottle of pills was still there.[2] Because Gentry could not find the pills, he assumed Nadine had ingested them to end her life. Gentry asked Nadine if she needed anything, but her answers were too incoherent to understand.

At approximately 11:00 p.m., Gentry put a blanket over Nadine's head and then went to bed. When Gentry checked on Nadine about 5:00 a.m., her breathing was shallow, she was unable to open her eyes, and she was still incoherent. This time Gentry covered Nadine's head and face with pillows before returning to his bedroom. Awhile later Gentry returned to the living room to check on Nadine. She was still alive. Gentry paced the floor for about an hour trying to decide whether to call an ambulance to save her or to complete what he believed was an attempted suicide.

Gentry decided to end his mother's life for her. He held his mother's hand then pressed the pillows down over her face. Gentry held the pillows over his mother's face until he determined she was no longer breathing.

That morning at 7:47 a.m., Gentry called emergency personnel. When emergency medical technicians (EMTs) from the New Albany Fire Department arrived at the Gentry home, they discovered Nadine brain dead, lying on her back on the living room couch.[3] Gentry gave EMT Brian Gadd some papers which Gadd gave to the police officers who had arrived. These papers included a photocopy of the newspaper articles on the back of which Nadine had handwritten the note to Gentry and Duvall.

Police Detective Clark Jeffries was called to investigate Nadine's death. Detective Jeffries found a mouth print on one bloody pillow and a bloody bite mark on another pillow. He also observed that Nadine's face had deep indentations around the bridge of her nose where her glasses were

2. The pills were ones of an undetermined nature that either Gentry saved or misplaced while disposing of clients' medications or ones that Nadine saved or misplaced while she was a nurse. Nonetheless, Gentry and Nadine previously discussed her use of these particular pills in order to end her life.

Gentry had suggested other unassisted suicide alternatives to his mother because he did not think he had the courage to help her. In addition to taking the pills in the cabinet, Gentry suggested his mother roll over on her face into a pillow or put a plastic bag over her head in order to suffocate herself.

3. Gentry told the emergency personnel that the evening before his mother told him that she wanted to be left alone and that when he woke up at 7:45 a.m. that he found her with the pillows over her head and not breathing. However, Gentry later confessed and testified that he suffocated his mother to death. Thus, Gentry's actions leading to his mother's death are not in dispute here.

and her hands were crossed midway to her body, clutching a blanket.

Detective Jeffries informed Gentry of his rights, after which Gentry told him that his mother had smothered herself with a pillow. When Detective Jeffries stated that his claim was impossible, Gentry claimed his mother had probably overdosed. Gentry and Detective Jeffries then searched for pill bottles but found none. Next, Detective Jeffries asked Gentry for some samples of his handwriting in order to substantiate that Nadine actually wrote the note which was handwritten on the back of the photocopy and signed Nadine Winkelried G. Gentry was calm and very cooperative. He took Detective Jeffries into his bedroom and voluntarily gave Detective Jeffries several personal notebooks including a book titled "Dave's Book of Rhyme," "Annales Nugatorum," and a letter to a friend to aid the police in their investigation.

On May 3, 1991, Detective Charles Miller advised Gentry of his rights again. Gentry signed an Advice of Rights–Interrogation form and then voluntarily tape recorded his statement of what actually happened. Gentry told the police and later testified that he placed the pillows over his mother's head while she lay incoherent on the couch, applied pressure to the pillows to prevent her from being able to breathe, and held the pillows in place until he was sure his mother was no longer breathing. That same day Gentry was arrested and charged by information with knowingly killing his mother.

Floyd County Deputy Coroner John Dougherty, whom police called to the scene, determined that the blood markings on Nadine's face indicated that the pillow had been placed over her mouth twice and that there was some type of trauma to her face. Dougherty ordered a complete postmortem examination, which was performed by forensic pathologist Tracey Corey, M.D. Dr. Corey agreed that Nadine suffered some trauma to her face before she was suffocated to death.

Dr. Corey found the drug Mellaril present in Nadine's blood at a level above the therapeutic or beneficial concentration. However, Dr. Corey determined that Nadine could have survived the Mellaril level and that she did not die from Mellaril, but from suffocation. Dr. Corey also determined that Nadine was well developed, well nourished, suffered from multiple sclerosis, had a benign meningioma in her brain, but that she was not suffering from any immediate life threatening diseases.

At Gentry's three-day trial he testified that he suffocated his mother to death. The jury found Gentry guilty of murder and the trial judge sentenced him to the minimum 30 year sentence. Gentry appeals his conviction.

## DISCUSSION AND DECISION

### I. Murder

Gentry contends that the murder statute, I.C. 35–42–1–1, does not apply to his conduct of simply assisting his mother Nadine in voluntarily committing suicide. Specifically, Gentry claims that because Nadine had voluntarily taken an overdose of pills in an attempt to end her life that his helping her end her life by suffocating her with a pillow is not murder.

Gentry further argues that his conduct did not even constitute the lesser crime of causing suicide,[4] a class B felony, because he did not cause his mother's suicide by force, duress, or deception. Gentry claims that he merely assisted his mother in her voluntary suicide attempt and that the Indiana legislature had not chosen to make assisting suicide a crime.[5]

I.C. 35–42–1–1 provides:

> (b) A person who has knowledge that another person intends to commit or attempt to commit suicide and who intentionally does either of the following commits assisting suicide, a Class C felony:

---

4. IND.CODE 35–42–1–2.

5. Subsequent to the events here, the Indiana legislature enacted IND.CODE 35–42–1–2.5 prohibiting persons from assisting in suicide effective April 30, 1993. I.C. 35–42–1–2.5 provides:

A person who:

(1) knowingly or intentionally kills another human being ...

commits murder, a felony.

IND.CODE 35–42–1–2 provides:

A person who intentionally causes another human being, by force, duress, or deception, to commit suicide commits causing suicide, a Class B felony.

 Gentry misses the critical distinction between murder and causing suicide or assisting suicide. Murder requires that the defendant knowingly or intentionally perform the act which leads to the death of another human being. Causing or assisting suicide requires only that the defendant cause or assist another human being in taking his own life. Thus, to be subject to prosecution for causing suicide, a defendant need only cause—by force, duress, or deception—another human being to perform the act by which the other person himself commits suicide. To be subject to prosecution for assisting suicide, a defendant need only provide the physical means or participate in the physical act by which the other person himself commits suicide. To be subject to prosecution for murder, the defendant must knowingly perform the specific act which kills the other person.

[4] Here, the undisputed facts are that Gentry placed pillows over his mother's head and face, applied pressure to the pillows to prevent his mother from being able to breath, and held the pillows in place until his mother had suffocated to death. Even assuming that Nadine had attempted to commit suicide through a drug overdose, the undisputed fact is that Gentry knowingly and intentionally committed the act of suffocation which caused his mother's death.

Gentry did not by force, duress, or deception cause his mother to commit suicide, rather he actually performed the act which caused her death. Gentry did not merely assist his mother in committing suicide by simply providing the physical means by which she attempted suicide or by participating in Nadine's ingestion of pills, rather Gentry suffocated her causing her death. Gentry committed murder as clearly defined by our legislature.

## II. Legal Authority

Gentry next contends that we should find that he was legally authorized to kill his mother because she had voluntarily attempted to commit suicide and he was merely helping her achieve her final rest. Specifically, Gentry argues that his mother's "Concern for Dying" card [6] and final note granted him authority to assist her in carrying out her wish to die and that no legally cognizable harm can be done to those who consent. In addition, Gentry argues that *In re Lawrance* (1991), Ind., 579 N.E.2d 32, established his legal right to kill his mother after she had voluntarily attempted suicide.

 First, consent is not a defense to conduct causing another human being's death. *See Helton v. State*, (1993), Ind. App., 624 N.E.2d 499 (consent is generally not a defense to battery). Thus, even if we assume for argument sake that through her actions and course of conduct Nadine expressed a desire that Gentry kill her, her consent would not be a defense for Gentry's actions.

 Second, the *Lawrance* court did not hold that a person may kill a family mem-

(1) Provides the physical means by which the other person attempts or commits suicide.
(2) Participates in a physical act by which the other person attempts or commits suicide.
If this statute had been in effect in 1991 and if Gentry's sole involvement in his mother's death had been his provision of the pills by which his mother had attempted suicide, Gentry would have been guilty of assisting suicide. However, this was not Gentry's sole involvement in his mother's attempted suicide.

6. Nadine signed a Concern for Dying card which stated:

I direct that I be allowed to die and not be kept alive by artificial means and heroic measures. I ask that medication be mercifully administered to me for my terminal suffering even though this may shorten my remaining life.

Record at 697.

ber who wishes to die. Rather, the *Lawrance* court merely held that Indiana's Health Care Consent Act grants close family members legal authority to make health care decisions in consultation with physicians for an incompetent patient—including the right to consent or refuse treatment such as the administration of artificial nutrition and hydration—when no other health care representative or guardian has been designated for the patient. *Id.* at 38–40. Furthermore, the *Lawrance* court emphasized the numerous safeguards to constrain such health care decision-making, and pointed out that abuses are subject to criminal prosecution. *See Hall v. State* (1986), Ind., 493 N.E.2d 433 (affirming parents' reckless homicide conviction for withholding medical treatment from son).

Here, contrary to *Lawrance*, Gentry did not merely remove artificial medical treatment to allow his mother to die naturally. Rather, Gentry took positive, deliberate action to actually force his mother's premature death. *Lawrance* did not grant Gentry the legal authority to take such action.

Gentry did not have legal authority to kill his mother and consent is not a defense to actions causing the death of another. We find no merit in Gentry's contentions on this issue.

### III. Jury Instruction

Gentry contends that the trial court improperly gave the jury an instruction on erroneous acquittal. Specifically, Gentry claims that Final Instruction No. 2 improperly commented on his theory of the case and invaded the jury's right to determine how the law should be applied in the case.[7]

 The manner of instructing the jury lies within the sound discretion of the trial court. *Reaves v. State* (1992), Ind.,

586 N.E.2d 847, 855. Instructions are to be read as a whole and if all the instructions taken together inform the jury of the law relevant to the nature of the case and the facts involved in it, then the jury has been properly instructed. *Pointon v. State* (1980), 274 Ind. 44, 408 N.E.2d 1255, 1262–63. We will not reverse the trial court's rulings unless the instructions taken as a whole misstate the law or otherwise mislead the jury. *Reaves*, at 855.

 The jury instruction which Gentry challenges here has been approved numerous times.[8] *See Corbin v. State* (1990), Ind., 563 N.E.2d 86, 91; *House v. State* (1989), Ind., 535 N.E.2d 103; *Pointon*, 408 N.E.2d at 1263. This instruction serves as a guideline which provides criteria for the jury in its approach to its serious duties in a criminal trial. *Murray v. State* (1982), Ind., 442 N.E.2d 1012, 1021. Moreover, prior to this instruction, the trial court properly instructed the jury that instructions are to be considered as a whole and not separately, that the State must prove each element of the offense beyond a reasonable doubt, and that the defendant was presumed innocent. The trial court did not err in giving this instruction.

### IV. Admission of Gentry's Literary Materials

Gentry contends that the trial court erred in admitting into evidence certain literary materials written by Gentry, including "Dave's Book of Rhyme," "Annales Nugatorum," and a letter to a friend. Gentry asserts two arguments which we address separately. First, Gentry argues that the record does not indicate when these materials were seized and that police officers illegally seized the materials in a warrantless search after he gave police of-

---

7. Final Instruction No. 2 provides:
 If a defendant is innocent, he should not be convicted erroneously; but if a defendant is guilty, he should be convicted, otherwise a contempt of the law is aroused among the criminal classes and the safeguards of society are weakened.

8. Gentry's claim that this instruction was disapproved of in *Buchanan v. State* (1975), 166 Ind.

App. 430, 336 N.E.2d 654, *trans. denied*, is incorrect. In *Buchanan*, the instruction disapproved of referred to acquittal of a criminal instead of acquittal of the guilty and the jury knew that the defendant had been convicted of a prior crime. *Id.* 336 N.E.2d at 659. Thus there was a danger that the jury would consider the defendant a criminal even if innocent of the instant crime. *Id.*

ficers his house keys so that they could secure Nadine's house.

■ A valid consent to a search obviates the requirement of a warrant. *Covelli v. State* (1991), Ind.App., 579 N.E.2d 466, 472, *trans. denied.* In the present case, on the morning of Nadine's death, Gentry was very cooperative with police. He voluntarily searched his bedroom for these literary materials and then voluntarily gave them to Detective Jeffries as writing samples so that the police could substantiate that Nadine, and not he, had written the so-called suicide note. Record at 538, 801–04, Supplemental Record at 24, 42–55. Thus, the record clearly indicates that on the morning of Nadine's death, Gentry voluntarily gave the materials to the police and that they were not illegally seized.

Second, Gentry claims that these literary materials were improperly admitted because they were irrelevant, prejudicial and their admission violated his First Amendment rights.

9. In his journals Gentry spoke of the vile taste and resentment he had towards life. The excerpts read and published to the jury included the following.

Just swallow the bottleful and spare me more, your life near its end. I will soon be of no further use to you. Should have cashed in your ticket when dad bought the farm.

Twenty minutes or two years. Two seconds suits me better. Splat! A wet spot on the highway. Yeah depressing ain't I?

My ire reaches a dangerous level of late when confronted with the tribulations of others. I feel I will drown in it all and it angers me that my limits are breached due to the stress imposed from without. I am able to solemnly accept collapse from within more complacently. The outer world has taken on frightening hues and intensities now that my inner world is collapsing.

Overload! What a monster I am becoming. Pardon my outburst. I really am becoming a monster. I can't stand myself. The pain I cause: my mother attempts to communicate with me in her odd disconcerting fashion and I verbally incinerate her. Why? Superficially because she interrupted my solitude. But the dark depths of me spat up the acid that eats at me to punish her. I wanted to verbally abuse her more than I did, still do, though I now feel guilt seeping into me from who knows where.

■ Admission of evidence lies within the sound discretion of the trial court and will be reversed only for an abuse of discretion. *Harless v. State* (1991), Ind.App., 577 N.E.2d 245. Although motive is not an element of an offense, it is always relevant in the proof of a crime. *Knight v. State* (1990), Ind., 556 N.E.2d 968, 969.

■ Here, prior to trial, Gentry filed a motion to suppress his literary writings. This motion was denied. At trial, Gentry objected to the admission of anything except for the particular excerpts which he had discussed and stipulated to as relevant on the issue of motive and intent. Record at 804–07, 1088. Gentry did not object when the agreed upon excerpts were read from his journals.[9]

In addition, the intent and motive under inquiry was that of Gentry to knowingly kill his mother. The statements written by Gentry made the existence of such state of mind more probable. Moreover, because Gentry testified that he intentionally suffocated his mother until she was dead, the statements were not prejudicial.[10]

I resent her, and what her continued existence is doing to me. I see more and more in me that is worthless and disgusting. Was it hidden or is it newly created?

Record at 1082.

10. On appeal, Gentry argues for the first time that admission of these excerpts from his writings also violated his First Amendment right to freedom of speech. Gentry has waived this argument because he cannot state one ground for an objection at trial and advance another on appeal. *See Jester v. State* (1990), Ind., 551 N.E.2d 840.

Notwithstanding waiver, Gentry's argument is unavailing. Gentry voluntarily gave his literary journals to police officers to use in their investigation of his mother's death. Moreover, the fact that the right to free expression includes the right to keep a journal does not mean that personal writings may never be admitted as evidence of a crime as Gentry claims. *See English v. State* (1991), Ind., 575 N.E.2d 14, 15 (defendant's handwritten note found near the victim's body expressing threats to kill the victim admissible in defendant's murder trial); *Games v. State* (1989), Ind., 535 N.E.2d 530, *cert. denied,* 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 158 (1989) (defendant's letter to mother expressing sorrow for killing someone admissible even though letter did not indicate who defendant killed).

## V. Ineffective Assistance of Counsel

Gentry contends that his counsel was ineffective in failing to move for a mistrial after the prosecutor made racial and religious comments during his final argument.

 In order to prevail on a claim of ineffective assistance of counsel, the defendant must present strong and convincing evidence to show that his counsel's performance fell below an objective standard of reasonableness and that the result of the proceedings would have been different but for counsel's deficient performance. *McCollum v. State* (1991), Ind., 582 N.E.2d 804, 810–11. The decision to object to statements made by the opposing counsel in closing remarks is a matter of trial strategy which we will not second-guess on appeal. *Schiro v. State* (1989), Ind., 533 N.E.2d 1201, 1204–06, *cert. denied*, 493 U.S. 910, 110 S.Ct. 268, 107 L.Ed.2d 218 (1989). In determining whether a prosecutor's comments constitute misconduct, we consider whether the act placed the defendant in grave peril. *Robinson v. State* (1986), Ind., 499 N.E.2d 253, 256.

 In the present case, the prosecutor stated that only God can take a human life and referred to the fact that Gentry looked like the typical deacon and boy scout and that maybe if he were brutish or black that it would be easier to convict him. We agree with Gentry that through these statements the prosecutor improperly attempted to appeal to the racial prejudices and religious beliefs of the jurors. The State acknowledged in its appellee brief and at the December 3, 1993 oral argument that it was unfortunate that the prosecutor made these remarks, however, such recognition is too little, too late, and does not make these remarks forgivable. These comments were not merely unfortunate, they were outrageous, deplorable, and intolerable. The prosecutor would be well advised to review our constitution and the basic principles upon which our system of justice is based. The State must steadfastly remember that justice is blind and equally available to all, without regard to race, color, or creed. The prosecutor's remarks were unquestionably outrageous and improper.

However, the question presented today is whether Gentry's counsel was ineffective for not objecting to these improper remarks. Because Gentry himself referred to the testimony of church ministers and emphasized his involvement with the boy scouts and his religious activities to support his claim that his suffocating his mother was a loving, charitable act done solely to carry out Nadine's wishes, it is possible that Gentry's counsel did not object to the prosecutor's remarks as a tactical decision. We will not use hindsight to second-guess Gentry's counsel's choice of strategy. *Fugate v. State* (1993), Ind., 608 N.E.2d 1370, 1373.

Moreover, although the prosecutor's statements were extremely offensive to us all, they did not affect the outcome of this case. Gentry testified that he suffocated his mother to death. Gentry's testimony alone was sufficient to convince the jury of his guilt beyond a reasonable doubt. Because the prosecutor's comments did not affect the outcome of the case, there is no ineffective assistance of counsel. *Moran v. State* (1992), Ind.App., 604 N.E.2d 1258, 1263, *trans. denied*. Gentry received effective assistance of counsel in this regard.

---

We also note that a party's own statement (oral or written) which is offered as evidence against him is not inadmissible hearsay as Gentry claims. *See* Ind. and Federal Rules of Evidence 801(d)(2)(A). In addition, Gentry incorrectly claims that these materials were a major part of the State's case and that according to *U.S. v. Lemon*, 723 F.2d 922 (D.C.Cir.1983), he is improperly being penalized for exercising his constitutional right to free expression. Gentry admitted killing his mother; and therefore, these materials were not even necessary to the State's case. Moreover, Gentry is being punished for killing his mother, not for his writings. The *Lemon* court did not state that a defendant's writings could not be used to show motive or intent, but merely held that it is improper to punish a person for doing what the law allows him to do; that is, it is improper to aggravate a defendant's sentence simply because he held membership in an organization absent proof that the organization had illegal aims and the defendant intended to further those aims. *Lemon*, at 937.

## CONCLUSION

Gentry was properly charged and convicted of murder. Gentry did not have legal authority to kill his mother based on her alleged consent. Gentry's literary materials were properly admitted into evidence after he voluntarily gave them to the police to assist them in their investigation. Gentry received effective assistance of counsel.

Judgment affirmed.

NAJAM and RUCKER, JJ., concur.