Larry **BELLMORE**, Appellant
(Defendant Below),

v.

**STATE of Indiana**, Appellee
(Plaintiff Below).

No. 55S00–8703–CR–328.

Supreme Court of Indiana.

Oct. 29, 1992.

Brent Westerfeld, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

DICKSON, Justice.

After finding the defendant, Larry Bellmore, guilty of the stabbing and strangulation death of Donna Denney, the jury heard penalty phase evidence and recommended the death penalty. The trial judge concluded likewise and ordered the death penalty imposed. This direct appeal presents the following issues:

1) change of venue

2) jury sequestration

3) psychiatric examination of witnesses

4) admissibility of videotape and photographs of victim

5) sufficiency of evidence for conviction

6) instruction on acquittal of the guilty

7) instruction on flight

8) nondisclosure of State evidence

9) prosecutorial misconduct

10) newly discovered evidence

11) ineffective assistance of counsel

12) sufficiency of evidence of aggravator

13) constitutionality of Indiana death penalty

14) use of non-statutory aggravator

15) nature of relief to be afforded

We affirm the conviction and remand for a redetermination as to whether to impose the death penalty or other appropriate sentence.

The evidence supporting the judgment indicates that David B. Young and Donna Denney had been romantically involved. When the relationship ended, David became angry, blaming Donna's son, Steven Denney (age 20). David requested that his own son, David Wesley Young (age 19) (hereinafter "Wesley"), and the defendant Larry Bellmore (age 38), "rough up" Steven or Donna. There is disputed evidence as to whether David offered them $300 for this purpose. On June 30, 1985, at approximately 9:45 p.m., the defendant and Wesley drove to Donna's home in Morgan County near Martinsville. They talked with Donna on her exterior back porch for several minutes when the defendant suddenly attacked her, began choking her, threw her off the porch to the ground, and resumed choking her. Obeying instructions from the defendant, Wesley stabbed Donna twice in the abdomen. After continuing to choke the victim, the defendant announced, "She's dead," Record at 4024, and said that he was going into the house to "take something and make it look like a burglary." Record at 4027. The defendant and Wesley entered the house and the defendant rummaged around in the victim's bedroom, taking possession of a woman's purse. While the defendant and Wesley were still inside, Donna came into the house and attempted to telephone for help. The defendant knocked the telephone from Donna's hand and exclaimed, "The bitch won't die." Record at 4030–31. He then threw her to the floor and stabbed her repeatedly ("like a sewing machine") for 30 seconds. Record at 4034–35. He dragged her body outside and told Wesley to pick up the purse. It contained $190 which was later divided between the defendant and Wesley. The cause of Donna Denney's death was loss of blood due to multiple stab wounds to the heart, lungs, liver, and neck, with a contributing cause of manual strangulation.

### 1. Change of Venue

The defendant claims that the trial court erred in denying his motion for change of venue, which alleged pervasive pretrial publicity.

In the appellate review of this issue we apply an abuse of discretion standard. To establish such an abuse of discretion, the defendant must demonstrate the existence of two distinct elements: 1) prejudicial pretrial publicity and 2) the inability of jurors to render an impartial verdict. *Schweitzer v. State* (1989), Ind., 531 N.E.2d 1386, 1389.

In a hearing on the motion several months before trial, the defendant presented evidence of publicity of the case in local radio broadcasts and newspaper articles, along with information regarding the circulation of the newspapers in Morgan County.

In reviewing a claim of error for failure to grant a change of venue based on prejudicial pretrial publicity, this Court may examine the subsequent jury voir dire record. *Kappos v. State* (1984), Ind., 465 N.E.2d 1092, 1096. Although almost two-thirds of the twelve jurors had been exposed to such media coverage, the responses of each fail to indicate resulting prejudice. The defendant argues here that because the pretrial publicity had reached well over half of the jurors, the failure to change the venue was an abuse of discretion. We disagree. The defendant fails to show that the jurors could not lay aside

any preconceived impression and decide the case solely on the evidence. *See Williams v. State* (1990), Ind., 555 N.E.2d 133, 138.

We find no abuse of discretion by the trial court in denying the defendant's motion for change of venue.

### 2. Jury Sequestration

Before trial, the defendant moved for the pool of prospective, unsworn jurors to be sequestered as it became apparent after each day of voir dire that they would likely be members of the jury due to the selection process being used. The trial court denied the request but granted the defendant's motion to sequester the jury once it was sworn.

In a capital case, the trial judge must grant the defendant's timely motion for sequestration of the jury. *Lowery v. State* (1982), Ind., 434 N.E.2d 868, *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900. However, in *Poling v. State* (1987), Ind., 515 N.E.2d 1074, *cert. denied*, (1989), 490 U.S. 1008, 109 S.Ct. 1646, 104 L.Ed.2d 161, this Court upheld a trial court's refusal to grant the defendant's motion to sequester probable jurors during voir dire where the jury was sequestered after it was sworn.

In the present case, the record indicates that all prospective jurors received written instructions admonishing them neither to view or listen to media coverage nor to discuss the case with others. The trial judge repeated the admonitions in his opening statements to each group of prospective jurors. We decline to find error in the trial court's denial of the motion to sequester prospective jurors.

### 3. Psychiatric Examination of Witnesses

The defendant asserts that the trial court abused its discretion by refusing to order psychiatric examination of two witnesses for the State, David Young and Mark White, to determine their competency to testify. White testified at trial. Young committed suicide before the trial, and the State was permitted to use his deposition.

A competent witness is one who has "sufficient mental capacity to perceive, to remember and to narrate the incident he has observed and to understand and appreciate the nature and obligation of an oath." *Ware v. State* (1978), 268 Ind. 563, 565, 376 N.E.2d 1150, 1151. A witness is presumed to be competent. *Gosnell v. State* (1978), 268 Ind. 429, 430, 376 N.E.2d 471, 472. If evidence places the competency of a witness in doubt, the trial court should order a psychiatric examination. *Mengon v. State* (1987), Ind., 505 N.E.2d 788, 790. The trial court has wide discretion in disposing of motions for psychiatric examination and will be reversed only for manifest abuse of discretion. *Stewart v. State* (1982), Ind., 442 N.E.2d 1026, 1031; *Gosnell*, 268 Ind. at 430, 376 N.E.2d at 472.

The defendant supported his request for psychiatric examination of David Young with an allegation of a previous suicide attempt and evidence that Young had made claims of Vietnam military service and combat "flashbacks," further arguing that Young's army service, 1958–1961, was not contemporaneous with the history of United States troop involvement in Vietnam. As to his half-brother, Mark White, the defendant presented evidence that White had been involuntarily committed to a mental institution thirteen years prior to trial, that he had more recently committed himself to a mental health center, and that he made grandiose claims of employment by well-known public figures.

Despite these contentions, we do not find sufficient facts in the record to demonstrate a manifest abuse of discretion by the trial court's refusal to order psychiatric examinations of these witnesses.

### 4. Videotape and Photographs of Victim

The defendant claims the trial court erred during the guilt phase by admitting various photographs and a videotape of the deceased victim's residence and her body in the rear yard where it was discovered. He argues that their cumulative and gruesome

nature inflamed the passions of the jury.[1] As noted by the defendant, the videotape shows the victim's body with ants and flies on it.

The trial court in its discretion may admit photographs that depict graphically the injuries of the victim. *Fozzard v. State* (1988), Ind., 518 N.E.2d 789; *Lowery v. State* (1985), Ind., 478 N.E.2d 1214. Photographs that demonstrate a witness's testimony are generally admissible. *Fozzard*, 518 N.E.2d at 793. To exclude them from evidence, a defendant must show that the improper influence of the photographs on the jury outweighs their probative value to such an extent that they are unduly prejudicial. *Lowery* at 1225. We will apply the same standard for admission of videotapes.

In the present case, the photographs show the nature and extent of the victim's injuries. The videotape shows the location and condition of the body shortly after it was discovered, as well as the layout of the victim's dwelling. Both the photographs and the videotape are demonstrative of testimony explaining the separate stabbing attacks by the accomplice and the defendant. These photographs also support the State's position that while the victim could have survived the wounds inflicted by the accomplice, the subsequent attack by the defendant resulted in her death. This evidence is not shockingly gruesome, nor is its prejudicial impact excessive. *See Smith v. State* (1984), Ind., 470 N.E.2d 1316, 1318. We find sufficient probative value to support the trial court's exercise of discretion in admitting the photographs and the videotape.

### 5. Sufficiency of Evidence for Conviction

The defendant claims that the State's evidence supporting his murder conviction is inherently incredible and therefore insufficient to support the verdict. First, he claims that the State "purchased,"

through generous plea agreements, the testimony of the other participants in the crime, David and Wesley Young. The defendant also argues that witness Clea Collins cannot be believed because of inconsistencies in his testimony as to whether he provided information to Crime Stoppers, a joint media-law enforcement effort to gather information regarding unsolved crimes. The testimony of Mark White is likewise incredible, he claims, because the State paid him an additional one hundred dollars after he testified.

This Court will reverse a jury verdict where the evidence supporting the verdict is so incredible as to be beyond belief or is without probative value. *Maynard v. State* (1987), Ind., 513 N.E.2d 641, 644–45. Where the evidence is not inherently incredible, the jury determines witness credibility. *Id.* at 644.

We find that the questioned evidence was not inherently incredible and therefore reject the defendant's contention that the evidence was insufficient to sustain his conviction for murder.

### 6. Instruction on Acquittal of the Guilty

The defendant contends that the trial court erred in giving an instruction that included language that "acquittal of the guilty" arouses a contempt of the law "among the criminal classes." He contends that the instruction impairs the presumption of innocence and the requirement that guilt must be proven beyond a reasonable doubt.

Instructions containing substantially similar language have been approved by this Court. *Timmons v. State* (1992), Ind., 584 N.E.2d 1108, 1113; *Murray v. State* (1982), Ind., 442 N.E.2d 1012, 1021; *Pointon v. State* (1980), 274 Ind. 44, 408 N.E.2d 1255, 1262. Because we are not persuaded that the instruction violated the guarantees of

---

**1.** The defendant also contends that the admission of gruesome and cumulative evidence violates the Eighth and Fourteenth Amendments by focusing jury attention upon the victim, in violation of *Booth v. Maryland* (1987), 482 U.S. 496,

107 S.Ct. 2529, 96 L.Ed.2d 440. Because *Booth* was expressly overruled and rejected in *Payne v. Tennessee* (1991), 501 U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720, this contention is without merit.

the Fourteenth Amendment, we find no error on this issue.

### 7. Instruction on Flight

The defendant asserts that an instruction given on flight created a presumption of guilt upon proof of flight and shifted the burden of proof in violation of *Francis v. Franklin* (1985), 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344, and *Sandstrom v. Montana* (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. The State may not use evidentiary presumptions in a jury instruction that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime. *Id.; Francis,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344.

 The following instruction was read to the jury:

The flight of a person immediately after the commission of a crime and other evidence of actions calculated to hide a crime, though not proof of guilt, are evidence of consciousness of guilt and are circumstances which may be considered by you in connection with all the other evidence.

The defendant urges that the instruction operated to create a mandatory presumption as to "all the elements of murder."

Although this instruction permitted flight and concealment conduct to be considered as evidence of *consciousness* of guilt, it did not authorize an evidentiary presumption regarding any element or ultimate fact upon which the State had the burden of persuasion. To the contrary, it included the specific admonition that such conduct was "not proof of guilt." We find that the specific language of this instruction could not "reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense." *Francis,* 471 U.S. at 315, 105 S.Ct. at 1971, 85 L.Ed.2d at 354. Furthermore, when viewing the potentially offending words in the context of the instructions as a whole, we observe that Final Instructions 3, 9, and 15 repeatedly emphasized the burden of the State to prove every essential element of

the charged crime beyond a reasonable doubt. Record at 436, 445, 451.

Although not recommending future use of this instruction, we find that its use in this case did not constitute a violation of the defendant's right to due process of law. We find no reversible error on this issue.

### 8. Nondisclosure of State Evidence

The defendant contends that the State suppressed evidence favorable to his defense, contrary to his federal and Indiana constitutional due process rights. Approximately six months before trial, the defendant filed a motion requesting the State to produce the questions, graphs, and examiner's interpretations of polygraph tests given to the defendant and others, including "any other individual in connection with this case." The motion also sought any and all evidence favorable to the defendant and material to the issues of guilt or punishment. The trial court granted the motion as to these requests. In his claim of error on this issue, the defendant argues that the State failed to disclose until after trial that "witness Mark White was paid an additional $100 for his testimony" and that one of the defendant's potential alibi witnesses had passed a polygraph examination.

 To succeed in a claim that the suppression of evidence by the prosecution violates an accused's rights to due process, the defense must show, among other things, that the suppressed evidence was material either to guilt or to punishment. *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Such evidence is considered material only if there is a reasonable probability that in the event of disclosure the result of the proceeding would have been different. *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481.

 With respect to Mark White, the fact that the prosecutor's office paid him $100 after trial is not material for this purpose. He had come from Florida to Martinsville to testify at the trial. The jury was aware that his expenses were

being paid by the State. When his presence was required for two extra days following his testimony, the State paid him the additional $100 to compensate for his unexpected loss of two days' work. There is nothing in the record to suggest that the additional payment was known or anticipated by White at the time of his testimony. We find that there is no reasonable probability that disclosure would have produced a different result.

The defendant contends that if the defense had known that potential alibi witness Debbie Rogers had passed a polygraph examination, his trial attorney would not have withdrawn the alibi defense. He argues that Rogers could have provided evidence that on the night of the crime the defendant came into the convenience store where she worked. The defendant maintains that his trial attorney abandoned the alibi defense because time records obtained from Rogers's employer were inconsistent with her testimony, resulting in his attorney's loss of confidence in her truthfulness.

To determine whether there is a reasonable probability of a different result, we here consider not only whether his attorney would have presented an alibi defense, but also whether the resulting evidence would have produced a different result. Giving due consideration to the entire body of evidence presented, as well as to the strengths and weaknesses of the alibi testimony which defendant contends would have been presented, we conclude that there is no reasonable probability that disclosure of the polygraph information regarding Debbie Rogers would have produced a different result.

We find no error on this issue.

### 9. Prosecutorial Misconduct

The defendant contends that he was denied due process by reason of ten acts of alleged misconduct by the prosecuting attorney. In reviewing claims of prosecutorial misconduct, there are two component questions: 1) whether the prosecutor engaged in misconduct and 2) whether the alleged misconduct placed the defendant in a position of grave peril or evinced a delib-

erate attempt to improperly prejudice the defendant. *Collins v. State* (1987), Ind., 509 N.E.2d 827; *Burris v. State* (1984), Ind., 465 N.E.2d 171; *Maldonado v. State* (1976), 265 Ind. 492, 355 N.E.2d 843.

Among the alleged acts of prosecutorial misconduct, the defendant lists the "suppression" of information regarding the alibi evidence of Debbie Rogers and regarding Clea Collins's role in providing initial information. As separately discussed in Issues 8 and 10 of this opinion, neither of these instances were of sufficient import to constitute grave peril. Nor does the defendant demonstrate that either were deliberate attempts at improper prejudice. The failure to show grave peril or deliberate prejudicial conduct likewise applies to the defendant's allegations of misconduct for paying Mark White $100 after he testified. See discussion in Issue 10, *infra*.

The defendant alleges prosecutorial misconduct during the State's penalty phase summation due both to mention of religious reasons for imposition of the death penalty and to remarks that other attorneys were concerned that the defendant "should be taken off the street." As there were no timely objections to any of these comments at trial, the issue of prosecutorial misconduct is therefore waived. *Mftari v. State* (1989), Ind., 537 N.E.2d 469; *Games v. State* (1989), Ind., 535 N.E.2d 530, *cert. denied*, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 158; *Abercrombie v. State* (1985), Ind., 478 N.E.2d 1236; *Maldonado*, 265 Ind. 492, 355 N.E.2d 843.

During the State's opening statement and final argument in the penalty phase, the prosecutor commented about the defendant's lack of remorse. The defendant maintains that these remarks constituted an impermissible comment upon his right to remain silent and thus were prosecutorial misconduct.

There was no objection to the prosecutor's reference to lack of remorse during the State's final argument. This claim is thus waived. When the State made such comments during its opening statement, the defendant did object on grounds of

relevancy, but did not claim improper comment on the right to remain silent or prosecutorial misconduct. His claim of error on this issue is therefore waived for failure to specify this ground as a basis for his objection at trial. *Dickerson v. State* (1986), Ind., 488 N.E.2d 346; *Hobbs v. State* (1990), Ind., 548 N.E.2d 164; *Lewis v. State* (1987), Ind., 511 N.E.2d 1054.

Citing the State's display of the victim's photograph during voir dire and penalty phase remarks relating to the effect of the murder on the victim and the victim's family, the defendant submits the State violated the prohibition against victim impact arguments in *Booth v. Maryland* (1987), 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440. This argument has been nullified by *Payne v. Tennessee* (1991), 501 U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720, which expressly overruled both the holding and the rationale of *Booth.*

■ The defendant claims misconduct by the prosecutor in "displaying a statue of a wolf in sheep's clothing" in her Courthouse office with the name of the defendant's trial attorney on it. The "statue" was a toy stuffed animal approximately one foot high which had been in the prosecutor's office for several months bearing a name tag with the name of various individuals from time to time. Defense counsel had long been aware of it and during trial filed a Motion to Prevent Prejudicial Displays. Upon learning of the concern that it might be seen by members of the jury, the prosecutor promptly removed it. There was no evidence that the statue had been seen by any juror and, thus, no showing of grave peril. Furthermore, the defendant does not argue that the display was a deliberate attempt to prejudice the jury against him.

■ The defendant alleges that the State's timing in filing the information requesting the death penalty constituted an act of prosecutorial misconduct. The information charging murder was filed July 17, 1985. The initial death penalty request was filed September 16, 1985, and dismissed on November 11, 1985, for lack of specificity. A new information seeking the death penalty was filed December 12, 1985. Trial began January 6, 1986. The defendant fails to show how the State's actions in filing the death count at these dates amounted to prosecutorial misconduct.

We find no error on the issue of prosecutorial misconduct.

### 10. Newly Discovered Evidence

The defendant contends that the trial court erred in denying his request for a new trial based on newly discovered evidence, which claim was included in his motion to correct errors. The alleged newly discovered evidence consists of claims that Wesley Young asked a fellow inmate whether Wesley's plea agreement would be affected if it were discovered that he lied to the authorities; David Young was seen driving in Martinsville at the time he claimed to be at home; the discrepancy between the potential alibi witness's statements and her timecard could be minimized due to frequent inaccuracies in fellow-employees' records; and Mark White lied at trial and received an additional $100 for his testimony.

■ Newly discovered evidence merits the granting of a new trial where the defendant shows that the evidence: 1) has been discovered since trial; 2) is material and relevant; 3) is not cumulative or merely impeaching; 4) is not privileged or incompetent; 5) could not have been discovered by due diligence before trial; 6) is worthy of credit; 7) can be produced upon retrial; and 8) would probably produce a different result. *Watkins v. State* (1988), Ind., 528 N.E.2d 456. The granting of a new trial is within the trial judge's discretion. *Id.*

With his motion to correct errors, the defendant presented the trial judge with the affidavit of Danny Barker, a fellow inmate of Wesley Young and the defendant. Barker claimed that Young asked him what would happen if the authorities discovered that he lied or that the necklace found at the scene belonged to him and not to the defendant. The trial judge rejected this information as newly discovered evi-

dence because it was known before trial. He further stated that even if Barker's information was newly discovered, it was merely impeaching evidence that would not produce a different result. The trial judge did not abuse his discretion in this ruling.

The defendant also presented the affidavit of one Gerald Hunt, asserting that Hunt saw David Young driving in Martinsville sometime between 10:30 and 10:45 p.m. on the night of the murder. If true, this evidence would conflict with testimony that Young had telephoned his friend Lana Curry from his home in Mooresville at 10:30 p.m. and chatted for several minutes. At the hearing on the motion to correct errors, Hunt testified that it was sometime after 10:00 p.m. that he saw David Young, but that he had no recollection how long after 10:00 p.m. Finding Hunt's testimony at the hearing to be more accurate, the trial judge ruled that the new evidence was cumulative and only slightly impeaching, and therefore not a proper basis for granting a new trial. This determination is within the reasonable exercise of discretion by the trial court.

■ At the hearing on his motion to correct errors, the defendant presented two employees of the convenience store that employed Deborah Rogers. These witnesses testified that the timecards for employees were occasionally inaccurate as to the days worked. This evidence, the defendant claims, could explain the discrepancy between the pretrial statements of Deborah Rogers and her timecards.

In a pretrial deposition, Deborah Rogers stated that the defendant came into the convenience store at about the same time the murder was alleged to have occurred. The defense counsel planned to use her as an alibi witness and accordingly filed an alibi defense. An investigator for the prosecution discovered that Rogers's timecard showed that she did not work on the date of the crime. Because Rogers could not offer an explanation for the discrepancy, the defense counsel withdrew the alibi defense shortly before trial. The State then considered using Rogers as a false alibi witness and subpoenaed her. When Rog-

ers refused to sign the earlier deposition, the prosecutor threatened to charge her with perjury and the State's investigator asked Rogers to take a polygraph test as to whether she lied in her deposition. The results, which became known after trial, support a conclusion that Rogers did not lie in her deposition. However, at the sentencing hearing, Rogers stated that she did not remember what night she saw the defendant in the store or whether she worked the night of the crime.

The evidence of occasional inaccuracy in employee timecards does not warrant a new trial. The evidence could have been discovered by due diligence, especially since the defendant's wife, also an employee of the same convenience store, knew of the occasional inaccuracies. Furthermore, since polygraph results are not admissible, *Couch v. State* (1988), Ind., 527 N.E.2d 183, and Rogers's testimony in the sentencing hearing was equivocal, we cannot conclude that the evidence of occasional timecard inaccuracies would be likely to produce a different result.

■ The defendant also presented the affidavit of Mark White with his claim that his trial testimony was "not entirely true" in that Wesley Young did *not* tell him that the defendant killed Donna Denney. The affidavit also refers to the receipt of the State's additional post-trial expense payment to Mark White. The trial judge rejected this evidence as a basis for a new trial because White's denial of being entirely truthful was not worthy of credit and would not produce a different result. Further, he reasoned that White's trial credibility had been adversely influenced by his demeanor and inconsistent answers. Regarding the payment, the trial judge stated that it was cumulative and slightly impeaching.

The trial court did not abuse its discretion in denying the defendant's request for a new trial on grounds of newly discovered evidence.

### 11. Ineffective Assistance of Counsel

The defendant asserts that he was denied his rights under the federal and Indiana

Constitutions to the effective assistance of counsel, citing three particulars: 1) the trial court's failure to appoint co-counsel; 2) his trial counsel's failure to more fully investigate the possible alibi defense; and 3) his attorney's failure to investigate, prepare, and present evidence of mitigating circumstances during the penalty phase.

 Reversal for ineffective assistance of counsel is appropriate in cases where a defendant shows both that counsel's performance fell below an objective standard of reasonableness and that said deficient performance so prejudiced defendant as to deprive him of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. A claim of ineffective assistance must identify the claimed errors of counsel so that the court may determine whether, in light of all circumstances, counsel's actions were outside the range of professionally competent assistance. The proper measure of attorney performance is reasonableness under prevailing professional norms. It shall be strongly presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Judicial scrutiny of counsel's performance is highly deferential and should not be exercised through the distortions of hindsight. Isolated poor strategy, inexperience, or bad tactics do not necessarily amount to ineffectiveness of counsel. If deficient performance of counsel can be proven, defendant must further show a reasonable probability that it altered the outcome of the case. *Id.; Chupp v. State* (1987), Ind., 509 N.E.2d 835; *Burr v. State* (1986), Ind., 492 N.E.2d 306; *Jackson v. State* (1985), Ind., 483 N.E.2d 1374; *Price v. State* (1985), Ind., 482 N.E.2d 719; *Seaton v. State* (1985), Ind., 478 N.E.2d 51.

The defendant argues that his right to counsel was violated by reason of the trial court's failure to appoint co-counsel "in light of [trial counsel's] lack of qualifications with respect to capital litigation or major felony defense." [2] Brief of Appellant at 113.

 While affirming a trial court's refusal to appoint two attorneys to represent a capital defendant in his appeal, this Court recently expressed concern, particularly with respect to the demands upon a single trial counsel in a capital case.

We are cognizant, however, of the growing belief that two trial counsel are necessary for a complete defense in a capital case. While there are valid reasons for this belief, those reasons do not apply with equal force with respect to the job for which lone counsel was appointed in this case [preparation of the motion to correct errors]. For the most part, counsel preparing a motion to correct errors gives consideration to the records and any newly discovered evidence. Trial counsel, by contrast, must deal with and prepare pleadings and motions, meet multiple time limitations, conduct investigations, negotiate with counsel for the State, meet with the court, and prepare for and attend the trial.

*Woods v. State* (1989), Ind., 547 N.E.2d 772. Beginning January 1, 1992, we now require the appointment of two qualified attorneys to represent an indigent person where the death penalty is sought. Ind. Crim.R. 24(B).

In the present case, however, the defendant fails to establish that the quality of legal representation was impaired in any manner which would necessarily have been avoided by the appointment of a second defense counsel. He does not demonstrate

**2.** Following his graduation from law school in 1975, the defendant's court-appointed trial counsel served as a deputy prosecutor for approximately one year during which time he served as the sole attorney for the prosecution in numerous jury trials, including felonies. In his ensuing private practice, he represented the defense in several criminal trials. For two years he served as a County Court Judge with small claims, misdemeanor, and minor felony juris-diction, and then returned to a general private law practice four years before representing the defendant at trial in this case. He had never previously represented an accused in a capital murder trial. The defense trial counsel had attended various seminars regarding trial practice and criminal defense, including a death penalty seminar conducted during the pendency of this case.

any specific harm resulting from the alleged lack of experience. His general argument regarding the uniqueness of the bifurcated proceedings and the penalty phase does not persuade us that constitutional considerations necessarily require the appointment of co-counsel in all cases. We shall consider the defendant's separate contention that his trial counsel's performance itself constituted ineffective assistance.

■ The defendant finds unreasonable his trial counsel's decision not to further investigate the alibi defense once the conflict arose between the statements of Deborah Rogers and her timecard. A further investigation, he claims, would have shown that employee timecards were occasionally inaccurate and that Rogers may have seen the defendant at the time of the crime.

At the hearing on the motion to correct errors, the defendant's trial counsel explained why he abandoned the alibi defense. First, Rogers's timecard and work schedule showed that Rogers did not work the night of the crime. The trial counsel also noted the marked change in the demeanor of Rogers regarding the certainty of her earlier statements. He was understandably concerned about putting a vacillating witness on the stand in an effort to exculpate his client. Rogers's equivocal testimony at the sentencing hearing confirmed the validity of counsel's concern. The trial counsel made a reasonable professional judgment that the alibi defense was seriously impaired and therefore did not justify further investigation.

■ To support his argument that defense counsel was deficient in preparing for the penalty phase trial, the defendant argues that "a wealth of information" was available but not obtained, and alleges that counsel's failure to obtain this information led to a professionally unreasonable decision not to present the testimony of the defendant or other witnesses.

During the hearing on the motion to correct errors, the defendant's trial counsel testified that he did not seek any records regarding the defendant from his high school, from the Indiana Boys' School,

from the Marion County Juvenile Division, from a psychiatrist who allegedly saw the defendant when he was 15 years old, from the U.S. Army, or from alleged hospitalizations in Japan and in Putnam County, Indiana. However, the record fails to contain the documents claimed to have been ignored. The defendant fails to show that such records existed and to provide evidence of their substantive content.

■ In representing a capital murder defendant during the penalty phase, counsel should make a reasonable effort to review potentially significant records pertaining to the client's personal, family, social, and medical history. This may be an important source for developing probative evidence of mitigating circumstances appropriate for consideration under Ind.Code § 35-50-2-9(c). However, we will not find ineffective assistance of counsel for failing to find records not shown to exist or to investigate records whose contents are not demonstrated to contain significant mitigating information. The defendant has thus failed to establish that the trial counsel's penalty phase representation was deficient and that the alleged deficiency was so prejudicial as to deprive the defendant of a fair penalty phase trial.

### 12. Sufficiency of Evidence Supporting Penalty

The defendant contends that the death sentence is not supported by sufficient evidence of the charged aggravator and that it is manifestly unreasonable in light of the significantly lesser penalties given to Wesley Young and David Young. The latter claim was addressed and resolved against the defendant in the preceding discussion.

■ The sole charged aggravating circumstance was the intentional killing while committing burglary. The defendant argues that there was insufficient evidence to prove the "breaking" element needed to establish burglary. In order to establish that a breaking has occurred, the State need only introduce evidence from which the trier of fact could reasonably infer that the slightest force was used to gain unau-

thorized entry. *England v. State* (1988), Ind., 530 N.E.2d 100; *Trice v. State* (1986), Ind., 490 N.E.2d 757.

 As noted previously, the events of the crime began on the exterior back porch of Donna Denney's home. The doorway to the porch consisted of a primary inside wooden door and an outside metal screen door. Although conclusive evidence is lacking, the metal door appears to be equipped with a closure device. Exhibit 36, Record at 2980. In addition, in Exhibit 43, a photograph taken after the crime by police to show blood stains, the metal screen door is shown propped open with a rock. Record at 2987.

The evidence regarding the entry into the home came from the testimony of Wesley Young. When Wesley and the defendant pulled into the Denney driveway and exited the vehicle, the back porch light came on and the victim came out onto the porch where they talked for several minutes. When asked what the defendant said before attacking the victim, Wesley replied:

> He asked if he could go and use the bathroom. He wanted to get inside the house and I guess she saw through him kind of and she wouldn't let him in the house. She told him he could go behind the garage.

Record at 4014. The defendant then went off towards the garage, returning shortly thereafter. Minutes later, he began the attack on the victim. Then, stating that he believed her to be dead, the defendant told Wesley, "I'm going to go in and make it look like a burglary." Record at 4024. Both the defendant and Wesley entered the home. The defendant went in first. Record at 4027. Wesley admitted that they did not have permission to enter the house. Record at 4027–28.

We find that the evidence was sufficient to permit the jury to reasonably infer beyond a reasonable doubt the necessary "breaking" element in burglary, as included in the charged aggravating circumstance for the death penalty.

### 13. Constitutionality of Indiana Death Penalty

The defendant contends that the Indiana capital sentencing procedure, as applied in this case, violates the Indiana and federal constitutions on several grounds.

He argues that our statutory formulation (wherein the jury serves only to recommend and the trial court makes the final determination), combined with remarks in the State's jury voir dire, opening statement, and closing argument, further emphasized by the trial court's jury instructions, violate the standards of reliability required by the Eighth Amendment, citing *Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231.

In *Caldwell*, the U.S. Supreme Court held that a capital sentence is not valid when a sentencing jury is misled regarding its actual responsibility for determining the appropriateness of a death sentence. However, "to establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams* (1989), 489 U.S. 401, 407, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435, 443.

Unlike the *Caldwell* jury, which under Mississippi law made the sentencing decision, Indiana penalty phase juries serve a recommending function with the trial judge having final sentencing responsibility. *See Burris v. State* (1990), Ind., 558 N.E.2d 1067. We have rejected *Caldwell* claims in several cases. *See Evans v. State* (1990), Ind., 563 N.E.2d 1251; *Burris*, 558 N.E.2d 1067; *Wallace v. State* (1990), Ind., 553 N.E.2d 456; *Huffman v. State* (1989), Ind., 543 N.E.2d 360, *cert. denied*, 497 U.S. 1011, 110 S.Ct. 3257, 111 L.Ed.2d 767.

In the present case the jury instructions properly informed the jury of the court's responsibility to make the final determination of the sentence after considering the jury's recommendation. The remarks by the State during voir dire, opening statement and final argument likewise accurately described this procedure and even emphasized that the jury recommendation would be weighed very heavily and seriously by the trial judge. Record at 2088, 4597,

4643. We find no merit in the defendant's *Caldwell* claim.

██ The defendant next argues the Indiana statute violated his federal and state rights to due process for the reason that the burglary designated by the State as an aggravating circumstance was not separately charged as a substantive offense and thus, he was deprived of full procedural safeguards including the presumption of innocence and the requirement of proof beyond a reasonable doubt as to each element. Citing *State v. McCormick* (1979), 272 Ind. 272, 397 N.E.2d 276, he asserts that it is unconstitutional to find an aggravating circumstance based on another crime for which his guilt had not been determined with full constitutional protections. We disagree because the charged aggravator was not unrelated to the principal murder charge, and the aggravating conduct involved burglary instead of murder.

In *McCormick* the charged aggravator was that the accused committed another unrelated murder. Our concern was that the defendant would, in effect, be tried for the aggravator murder "to a jury undeniably prejudiced by having convicted him of an unrelated murder." *Id.*, at 278, 397 N.E.2d at 280. Where the charged aggravating circumstance was related to the principal murder, we noted that evidence of the aggravator would very likely already have come before the jury during the guilt phase trial, and that the "prejudicial impact resulting from the introduction of this evidence at the subsequent sentencing hearing is virtually non-existent." *Id.* The *McCormick* decision was expressly limited to "cases in which the murder alleged as an aggravating circumstance is not related to the principal murder charge." *Id.*, at 280, 397 N.E.2d at 281. *McCormick* does not apply to the present case because the charged aggravator is not an unrelated murder.

██ The defendant also claims constitutional error because, as to the burglary aggravator, the jury was not instructed in the penalty phase to apply the presumption of innocence and to require proof beyond a reasonable doubt as to each element of the crime of burglary.

At the conclusion of evidence in the penalty phase, the jury was told five separate times that the burden rests upon the State to prove beyond a reasonable doubt the existence of the alleged aggravating circumstance. Record at 465, 466, 474, 475. The trial court read to the jury the formal information seeking the death penalty. Charging as the aggravating circumstance an intentional killing while committing the crime of burglary, the information separately asserted the specific facts constituting the elements of the alleged burglary. Other instructions listed and explained the separate elements of the offense of burglary. Record at 468–71. The jury recommendation verdict included a special finding that the State "has proved beyond a reasonable doubt that the aggravating circumstance alleged does exist." Record at 497.

The Due Process Clause of the Fourteenth Amendment protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *Cage v. Louisiana* (1990), 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339; *In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368. Likewise, this clause has been held to require a trial court to give an accused's requested instruction on the presumption of innocence. *Taylor v. Kentucky* (1978), 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468. While the sentencing process must generally satisfy the requirements of the Due Process Clause, *Gardner v. Florida* (1977), 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393, it is within the power of individual states to regulate sentencing procedures, including the burden of proof, so long as it does not offend a fundamental principle of justice. *Patterson v. New York* (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281. This view has recently been refined and restated by the U.S. Supreme Court.

Every person has a fundamental right to liberty in the sense that the Government may not punish him unless and until it

proves his guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees. But a person who *has* been so convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual, and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment.

*Chapman v. United States* (1991), 500 U.S. ——, ——, 111 S.Ct. 1919, 1927, 114 L.Ed.2d 524, 538 (emphasis in original, citations omitted).

The capital sentencing procedures enacted by our General Assembly are a matter of legislative choice. The statutory provisions designate the specific aggravating circumstances which may support a death sentence and require the State to prove the existence of any charged aggravators beyond a reasonable doubt. Ind.Code § 35–50–2–9(a), (e), (f). With respect to the aggravator consisting of intentional killing while committing or attempting to commit certain enumerated criminal offenses, Ind. Code § 35–50–2–9(b)(1), the legislature has *not* chosen to require either that the penalty phase jury be instructed that such burden of proof applies to each element of such aggravating offenses or that the defendant is presumed innocent as to such crimes. We find that the absence of these instructions in the penalty phase does not run afoul of the Due Process Clause.

The defendant's arguments conclude by asserting, for purpose of preservation of error, several claims that the Indiana death penalty statute and its general operation violate the federal constitution. These alleged infirmities include: failure to adopt meaningful rules of review; failure to adopt meaningful rules of review for proportionality; failure to charge only by grand jury indictment; and total discretion of prosecution attorney in deciding whether to seek the death penalty. The defendant concedes that each of these contentions

have been clearly rejected to date. We decline his invitation to reconsider these decisions.

### 14. Use of Non-statutory Aggravator

Three months after the penalty phase trial and the jury's recommendation to impose the death penalty, the sentencing hearing was conducted. During the State's cross-examination of the defendant, he acknowledged the presence on his body of a tattoo showing a knife with dripping blood. On redirect, he explained that he had the tattoo put on his shoulder while in jail after the trial. When asked his reasons, he replied only that he had seen it in a book. By agreement of counsel, the trial court viewed the tattoo *in camera.*

The defendant contends that the trial judge erred in considering the tattoo as an aggravating circumstance not found among those enumerated in the death sentence statute.

In seeking the death penalty under Indiana law, the State must allege and prove beyond a reasonable doubt the existence of at least one aggravating circumstance. Ind.Code § 35–50–2–9(a). Subsection (b) states that "[t]he aggravating circumstances are as follows," and then enumerates with particularity twelve specific aggravating circumstances.[3] The death penalty may be ordered only if the aggravating circumstance or circumstances outweigh any mitigating circumstances. Ind.Code § 35–50–2–9(e). In a capital sentence, the trial court must provide a statement of its reasons for selecting the sentence. Ind.Code § 35–38–1–3; *Judy v. State* (1981), 275 Ind. 145, 416 N.E.2d 95. This statement should also articulate that the court evaluated and balanced the mitigating circumstances against the aggravating circumstances. *See, Hammons v. State* (1986), Ind., 493 N.E.2d 1250.

The statutory list of eight *mitigating* circumstances expressly includes "[a]ny other circumstances appropriate for

---

**3.** The legislature has periodically added and modified the designated aggravating circumstances in the statute. *Compare* Ind.Code § 35–

50–2–9(b) (West Supp.1991) (twelve aggravators) with Ind.Code § 35–50–2–9(b) (West 1986) (eleven aggravators).

consideration." Ind.Code § 35–50–2–9(c)(8). There is no analogous "open-ended" statutory authorization for consideration of non-listed *aggravating* circumstances in the determination of death sentences.

In *Minnick v. State* (1989), Ind., 544 N.E.2d 471, 482, this Court narrowly held that in a capital sentencing the trial court may consider other general felony statutory aggravators[4] even if not included among the death penalty statutory aggravators, as long as at least one of the capital statutory aggravators is proven. A strong dissenting opinion by Justice DeBruler urged that our death sentence procedure "does not permit the sentencer to consider aggravating circumstances other than those enumerated in the death sentence statute when engaged in the weighing process." *Id.* at 483. Because consideration of the tattoo may arguably fall within the express "open-ended" authorization for general felony aggravators in Ind.Code § 35–38–1–7.1(d)[5], *Minnick* may appear applicable to the present facts.

However, the holding of *Minnick* is confronted by recent decisions of the United States Supreme Court. Just this past term it observed that in states requiring the sentencer to weigh the statutory aggravating factors against the mitigating factors, there is Eighth Amendment error when the sentencer weighs an invalid aggravating circumstance in reaching the ultimate decision to impose death. *Sochor v. Florida* (1992), — U.S. —, —, 112 S.Ct. 2114, 2119, 119 L.Ed.2d 326, 336; *Stringer v. Black* (1992), 503 U.S. —, 112 S.Ct. 1130, 117 L.Ed.2d 367.

[W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale.

*Id.*, 503 U.S. at —, 112 S.Ct. at 1137, 117 L.Ed.2d at 379.

Whether the additional factors authorized in *Minnick* would be invalid aggravators under *Sochor* and *Stringer* is an unresolved issue. However, we do not reconsider the wisdom of *Minnick* because it is distinguishable from the present facts. The trial judge found that the State had proven beyond a reasonable doubt the alleged capital statutory aggravator, the intentional killing of Donna Denney while committing burglary. He further found the existence of two mitigating circumstances: 1) no involvement in violent criminal conduct for over 20 years and 2) disproportionality between a death sentence for the defendant and the lesser sentence given his accomplice.

The trial court's formal sentencing statement makes no mention of any aggravating circumstances other than those expressly authorized in the capital sentencing statute, Ind.Code § 35–50–2–9(b). However, in announcing[6] his decision that the mitigating circumstances are outweighed by the aggravating circumstance, Judge Harris explained his evaluation, including the following:

In considering and re-considering and re-re-considering all of the circumstances surrounding the death of Donna Denney, a horrible and tragic loss of life, and giving full consideration to those many things which the law states should affect

---

**4.** Distinct from the capital sentencing provisions of Ind.Code § 35–50–2–9, a separate list of aggravating factors is set forth in Ind.Code § 35–38–1–7.1 for consideration in determining whether to impose enhanced sentences in general felony cases.

**5.** Ind.Code § 35–38–1–7.1(d) provides: "The criteria listed in subsections (b) and (c) do not limit the matters that the court may consider in determining the sentence."

**6.** When a trial court in announcing a death sentence orally refers to factors not included in

the court's separate written findings regarding aggravating and mitigating circumstances, the issue whether such remarks demonstrate impermissible use of a nonstatutory aggravating factor depends upon a determination under state law as to whether the judge *relied* upon the nonstatutory factor. *Wainwright v. Goode* (1983), 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187. From the language and context of the remarks of Judge Harris, we must conclude that his decision to impose the death penalty here substantially resulted from his reliance upon the tattoo and its implications as an aggravating circumstance.

a decision as to the penalty which should be given in this case, there has been a degree of uncertainty as to what the final decision should be. That uncertainty no longer exists. It has disappeared in the tattoo voluntarily placed on the body of the defendant after the trial of this case but before this sentencing hearing. A tattoo which depicts a knife with dripping blood. Unfortunately, it also demonstrates a contemptible and callous attitude and suggests an audacity which is beyond the understanding of this court. At a time when remorse is appropriate, and the defendant has expressed none, he chooses by symbolism to thumb his nose at the law and at the Denney family who without question have suffered a tremendous loss, such an attitude is relevant and cannot be ignored. With due consideration to the mitigating circumstances that exist and the court has found as a matter of record and the aggravating circumstance which exists and the court has found as a matter of record, the court now finds the mitigating circumstances are outweighed by the aggravating circumstance.

Record at 5302–03. The *Minnick* rationale is not applicable to justify the use of a non-statutory aggravator in the present case for each of two reasons.

First, rather than merely *considering* a non-statutory capital aggravator, as in *Minnick*, the trial court here admittedly found such factor to be the *determinative* factor resulting in the sentence of death. The death sentence here was actually precipitated by an aggravating circumstance not among those designated and authorized by our legislature for purposes of capital sentencing.

Second, the tattoo and its implied callousness, audacity, and lack of remorse do not fall within any of·the aggravators specifically designated for general (non-capital) felony sentence enhancement in Ind.Code § 35–38–1–7.1(b), but rather only under the open-ended non-specific provision of Ind. Code § 35–38–1–7.1(d) which permits other matters to be considered as aggravators in general felony cases. The trial judge found the tattoo to symbolize a lack of remorse. While "lack of remorse" is not expressly included in the list of aggravators for non-capital felony sentence enhancement, it has been recognized as a proper factor to be considered in imposing such sentences. *Brooks v. State* (1986), Ind., 497 N.E.2d 210, 220–21; *Mullens v. State* (1983), Ind., 456 N.E.2d 411, 414. We decline, however, to extend *Minnick* to authorize such unlimited resort to non-statutory aggravators in *capital* sentencing proceedings. *But cf. Spranger v. State* (1986), Ind., 498 N.E.2d 931, 948 (lack of remorse may be considered in determining mitigating evidence of amenability to rehabilitation). Even if *Minnick* were applied to allow an express specific statutory general felony aggravator, Ind.Code § 35–38–1–7.1(b), to be weighed among the statutory death penalty aggravators, Ind.Code § 35–50–2–9(b), the open-ended authorization for general felony aggravators, Ind. Code § 35–38–1–7.1(d), would be impermissible in capital sentence proceedings as unconstitutionally vague. *See Maynard v. Cartwright* (1988), 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372; *Godfrey v. Georgia* (1980), 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398.

We conclude that in determining whether to impose the death sentence the trial court erroneously relied on an aggravating factor not available for consideration under Indiana law.

### 15. Nature of Relief to be Afforded

When a death sentence must be ·vacated for an irregularity in the trial court's sentencing decision-making process, this Court may elect to remand to the trial court for a new sentencing determination, *Kennedy v. State* (1991), Ind., 578 N.E.2d 633. Alternatively, we may affirm the death sentence upon a finding of constitutional harmless error or we may redetermine whether to impose the death sentence upon an independent reweighing of aggravating and mitigating circumstances to assure measured consistent application of the death penalty and assure fairness to the accused. *Sochor*, —— U.S. ——, 112 S.Ct. 2114, 119 L.Ed.2d 326; *Parker v. Dugger*

(1991), 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812; *Clemons v. Mississippi* (1990), 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725. This Court has long recognized and exercised its authority under our state constitution and statutes to conduct an independent reweighing of aggravating and mitigating factors in determining the appropriateness of a death penalty. *See, e.g., Johnson v. State* (1992), Ind., 584 N.E.2d 1092; *Woods v. State* (1989), Ind., 547 N.E.2d 772; *Cooper v. State* (1989), Ind., 540 N.E.2d 1216; *Schiro v. State* (1983), Ind., 451 N.E.2d 1047; *Judy v. State* (1981), 275 Ind. 145, 416 N.E.2d 95. However, we are not required by the federal constitution to necessarily engage in reweighing or harmless error analysis in the appellate review of capital sentences. *See Clemons*, 494 U.S. at 754, 110 S.Ct. at 1451, 108 L.Ed.2d at 742.

■ In the present case, we elect to vacate the death sentence and remand so that the trial judge may redetermine, without considering the tattoo as an aggravating circumstance, whether to impose the death sentence or any other appropriate sentence.

### Conclusion

We affirm the conviction for murder, but reverse the sentence of death and remand to the trial court for a new sentencing determination in accordance with this opinion.

KRAHULIK, J., concurs.

GIVAN, J., concurs except as to Issue (7) with which he concurs in result, and Issue (14) to which he dissents.

DeBRULER, J., concurs except as to Issue (12) to which he dissents with separate opinion, with which SHEPARD, C.J., concurs.

DeBRULER, Justice, concurring and dissenting.

The aggravating circumstance relied upon by the State to elevate this homicide to the capital class is set forth in I.C. 35–50–2–9(b)(1)(B):

The defendant committed the murder by intentionally killing * * * while committing ... Burglary (IC 35–43–2–1).

Burglary is defined by I.C. 35–43–2–1 as:

A person who breaks and enters the building or structure of another ... with intent to commit a felony in it, commits burglary, a class C felony.

The contention is made that there was insufficient evidence of the element of "breaking." In analyzing this essential element, the following was set forth in *Cockerham v. State* (1965), 246 Ind. 303, 204 N.E.2d 654:

In *Barrick v. State* (1954), 233 Ind. 333, 339, 119 N.E.2d 550, 553, we stated:

"The term 'breaking' as used in our statute denouncing the crime of burglary does not imply the actual fracturing of or injury to a material part of a building, such as a door or window. It includes the putting aside of any material part of the building intended as a security against invasion, such as removing a window screen, * * * or opening a closed door."

Walking through an open door does not constitute a "breaking" as such element is known in the crime of burglary. However, the use of the slightest force in pushing aside a door in order to enter does constitute a breaking through the doorway." *Link v. State* (1953), 232 Ind. 466, 113 N.E.2d 43.

A breaking is proved by showing that even slight force was used to gain unauthorized entry, as where a door left partially ajar is opened further in entering. *Howard v. State* (1982), Ind., 433 N.E.2d 753.

The proof in this instance is that the victim answered a knock to her door after dark on a summer evening. There was a regular inner door and an outer screen or storm door. The victim exited to the outside where she was first attacked. Appellant and his accomplice then entered through the doorway. The majority apparently finds sufficient circumstantial evidence to permit an inference to be drawn by a rational trier of fact to a certainty beyond a reasonable doubt that in so entering appellant or his accomplice physically

opened one of these doors rather than walking through an already open doorway. I find no such sufficient evidence in the testimony and photos of the doorway.

The State argues that there was sufficient evidence of a "breaking" in the proof that the door was closed by appellant in the process of entering. Clearly, when one closes a door in entering, the moving of the door to its closed position does not facilitate or gain the entry, and therefore cannot constitute a "breaking." *See Willard v. State* (1980), 272 Ind. 589, 400 N.E.2d 151.

In light of the insufficient proof of a "breaking" of the victim's dwelling, there is insufficient evidence of burglary and of the aggravating circumstance upon which this sentence of death is based. In such instances where the murder conviction is to be affirmed, the proper disposition of the appeal is to remand with instructions to enter the maximum prison sentence for murder provided for by law. *Thacker v. State* (1990), Ind., 556 N.E.2d 1315. That is the proper result in this case. In all other respects, I concur in the majority opinion.

SHEPARD, C.J., concurs.