In the Matter of Donald F. STRUTZ.

No. 02S00–8906–DI–466.

Supreme Court of Indiana.

June 16, 1995.

Donald F. Strutz, Fort Wayne, pro se.

Donald Lundberg, Jeffrey D. Todd, Indianapolis, for the Indiana Supreme Court Disciplinary Com'n.

PER CURIAM.

This disciplinary action is now before the court on a two count amended verified complaint charging the Respondent with conduct in violation of the *Code of Professional Responsibility for Attorneys at Law (Profes-*

*sional Responsibility Code)* and the *Rules of Professional Conduct for Attorneys at Law (Professional Conduct Rules).*[1] This case requires us to examine the professional responsibility of a lawyer engaged in business transactions with his client and of a lawyer serving as general counsel for a corporation during a change in management.

## I

The Indiana Supreme Court Disciplinary Commission filed its original complaint as required by Ind.Admission and Discipline Rule 23(12) in 1989. As provided in Admis.Disc.R.23 (11)(e), a hearing officer was appointed. Having conducted a hearing, the hearing officer has tendered findings of fact, conclusions of law, and a recommendation for sanction. The Respondent has petitioned this court for review of the hearing officer's report, asking us to vacate the findings, conclusions, and recommendations "for lack of jurisdiction and abuse of process." The Commission has responded and Respondent has replied.

In his petition for review, the Respondent challenges various procedural rulings and contends that certain events during the litigation of this disciplinary proceeding constitute the denial of due process.

## A

First, Respondent contends that he was denied due process because a second count was added to the complaint on motion by the Commission without having been filed with this court and without this court having appointed the hearing officer. Both counts arising in this proceeding evolved from grievances filed with the Commission in the late 1980's. On June 15, 1989, the Commission filed its verified complaint with respect to what was to become Count I. This court appointed the hearing officer later that month. After several years of discovery and continuances, the hearing officer in October, 1991, advised the parties that any amendment to the complaint was required to be submitted by December 31, 1991, and that

any response thereto was required by January 31, 1992. On December 31, 1991, the Commission filed its amended complaint, restating its original single count as Count I and adding a new Count II. Respondent moved to dismiss the amended complaint and to separate the counts. The hearing officer held a hearing and, on March 4, 1992, held that for the sake of judicial economy the two counts would be tried contemporaneously. The hearing officer found that Respondent failed to provide any authority for his motion to dismiss and that the hearing officer himself had failed to find any such authority.

■ No procedure is set forth in our Admission and Discipline Rules for amending a complaint of misconduct that has been filed with the Clerk under Admis.Disc.R. 23(12) and with respect to which a hearing officer has been appointed under Admis.Disc.R. 23(11)(e). We hold that the Commission may amend (including an amendment alleging additional misconduct) such a complaint, that the Respondent may amend any answer, by leave of the hearing officer or by written consent of the adverse party, and that leave shall be given when justice so requires. Leave of this court is not required and no new hearing officer need be appointed.

■ The Commission and the hearing officer followed the proper procedure here. Furthermore, as to Respondent's due process arguments, we note that we have previously addressed the question of procedural due process in a disciplinary proceeding. In such setting, due process requires notice and an opportunity to be heard in a fundamentally fair proceeding. *In re Wireman* (1977), 270 Ind. 344, 367 N.E.2d 1368, *cert. denied,* 436 U.S. 904, 98 S.Ct. 2234, 56 L.Ed.2d 402; *In re Murray* (1977), 266 Ind. 221, 362 N.E.2d 128, *appeal dismissed,* 434 U.S. 1029, 98 S.Ct. 758, 54 L.Ed.2d 777; *In re Stivers* (1973), 260 Ind. 120, 292 N.E.2d 804. Here, the Respondent was on notice that he was under investigation for the misconduct eventually charged in Count II for at least three years prior to the complaint being filed. The

1. Certain of the conduct at issue occurred prior to January 1, 1987, with respect to which the *Professional Responsibility Code* governs. The

*Professional Conduct Rules* took effect January 1, 1987, and they govern the conduct thereafter.

hearing officer did not permit the complaint to be amended until holding a hearing on the Respondent's objection to the amendment. And trial on Count II was not held for another year and a half after the complaint was amended. We find that Respondent had notice and an opportunity to be heard in a fundamentally fair proceeding; he suffered no deprivation of procedural due process.

### B

Respondent alleges with respect to the amendment of the complaint that the amendment was offered by the Commission "for the purpose of inflaming the Hearing Officer thereby creating irreversible bias and prejudice against the Respondent." However, Respondent does not cite any specific example of bias or prejudice and, in the absence of any such example, we find none.

Respondent also contends that he was denied due process because a transcript was not available to him to use in preparing proposed findings of fact and conclusions of law. Respondent offers no authority for this proposition and we find that he had no such entitlement.[2]

Respondent's petition to vacate the hearing officer's report is hereby denied.

### II

### A

Respondent began providing legal representation to a client in or about 1969. The client was a family-owned petroleum refinery business. Soon thereafter, Respondent became the refinery's president's primary adviser on all legal matters involving the refinery. In a short time, Respondent's participation in the affairs of the refinery became so extensive that he was placed on retainer

and was considered general counsel to the refinery. As general counsel to the refinery, Respondent was responsible for preparation of all leases and contracts involving the refinery's business. During this period of time Respondent also became personal counsel to the refinery's president himself.

In or about 1974, after consulting with a business associate, the refinery's president suggested to Respondent that the refinery construct a pipeline from the refinery's location to a major crude oil pipeline network in a neighboring community. Respondent agreed to this concept and a new corporation (the "pipeline corporation") was created for the purpose of building the pipeline.

With the assistance of outside counsel, the assets of the completed pipeline were transferred to a partnership (the "pipeline partnership") for tax reasons. The pipeline partnership consisted of forty-seven trusts. Respondent served as the refinery's attorney in this process and directed the establishment of the trusts by outside counsel. As attorney for the refinery, Respondent was consulted by the president regarding outside counsel's work product. Respondent negotiated with his client, the refinery president, for an ownership interest in the completed pipeline. Respondent told the president that partial ownership of the pipeline would serve to compensate him for the work he performed on the project. Respondent suggested a ten percent share of the trusts, but ultimately he agreed to accept a six percent share. Respondent never advised the president that obtaining such a share of ownership in the pipeline would give Respondent a personal interest in the pipeline that could conflict with the president's personal interests and those of the refinery.

Under the agreement between Respondent and his client, the refinery president, outside

2. In a separate "Affidavit," Respondent alleges misconduct on the part of the Commission attorney prosecuting the case. Respondent contends the Commission attorney engaged in improper communication with a witness and a lawyer apparently involved in filing the grievance. We decline to give these allegations extensive treatment. First, it does not appear that Respondent called this conduct to the attention of the hearing officer. While the rules of pleading and practice do not generally apply in disciplinary cases, we

feel constrained to treat as waived any allegation of prosecutorial misconduct that could have been raised at trial but was not. *See generally Bellmore v. State* (1992), Ind., 602 N.E.2d 111, 120, for this court's view on the necessity of a contemporaneous objection at trial to alleged prosecutorial misconduct in order to preserve the issue for appeal. Second, there is no allegation that the alleged misconduct placed the Respondent in peril or prejudiced him in any way.

counsel designated four of the forty-seven trusts for the benefit of Respondent and various members of his family. The forty-three remaining trusts were created for the benefit of the president and his family. With the agreement in place, the president's family trusts held a ninety-four percent ownership interest in the pipeline partnership while the Respondent's family trusts held a six percent interest. At the time the partnership agreement was executed, Respondent served as trustee of the president's family trusts.

The refinery president was unaware that the pipeline partnership partnership agreement contained a provision that certain actions fundamental to the business of the pipeline partnership required unanimous consent of all partners. The effect of the unanimous consent provision was to give each of the Respondent's family trusts the right to veto any actions by the partnership, even though Respondent's family trusts only owned a six percent interest in the partnership. The refinery's president relied upon Respondent's recommendation to approve the partnership agreement, and Respondent failed to advise the president of the existence of this unanimous consent provision or of its possible ramifications to the president, his family, and the refinery.

In early 1975, the pipeline partnership entered into a lease agreement with the refinery. This lease was drafted by the Respondent, and it provided that the refinery would pump no less than four thousand two hundred barrels of oil per day through the pipeline for a minimum of three hundred thirty days per year for a period of ninety-nine years. The lease fixed the price at thirty cents per barrel, but failed to provide for a modification of this guarantee in the event of adverse financial conditions at the refinery. Lease payments made by the refinery to the pipeline partnership would be distributed to the president's family trusts and to the Respondent's family trusts according to the designated percentage interest of each.

Shortly after the pipeline was in place, the refinery decided to build a facility to increase its capacity to store oil. Respondent and the refinery president agreed to use an owner-ship agreement similar to that used by the pipeline partnership that would provide Respondent and his family partial ownership of the storage facility. Again, with the help of outside counsel, Respondent and the refinery president created another partnership (the "terminal partnership") to own the storage facility. As with the pipeline partnership, the president's family's trusts owned a ninety-four percent share of the terminal partnership while the Respondent's trusts owned a six percent share.

The refinery's president did not know that the terminal partnership partnership agreement, like the pipeline partnership partnership agreement, contained a provision calling for the unanimous consent of all partners for any significant action to be taken by the partnership, thereby giving the Respondent's family trusts a veto power over the actions of the president's family trusts. Respondent signed this agreement as trustee for the president's family's trusts. Although he was the president's personal attorney and on retainer with the refinery, Respondent failed to advise the president of the unanimous consent provision.

Also in 1975, shortly after construction had been completed on the crude oil pipeline, the refinery became involved in a refined product pipeline that was to run from the refinery's terminal to a major pipeline network in another neighboring community. A corporation (the "refined product pipeline corporation") was created for the purpose of constructing and owning this refined product pipeline. In early 1976, the refinery entered into a throughput agreement with the refined product pipeline corporation, guaranteeing that a certain volume of refined product would be pumped through the pipeline annually and providing for minimum annual payments of $438,000. This agreement provided project creditors sufficient assurance that the owner of the pipeline (an apparently unrelated party) could service the debt incurred in construction of the pipeline and provided the owner with a return on his investment. Also in early 1976, the pipeline partnership (in which Respondent's family's trusts had a six percent interest) entered into an option agreement that gave it the option to pur-

chase the refined product pipeline corporation.

In 1978, the pipeline partnership exercised its option and entered into an agreement for the purchase of the refined product pipeline. This agreement required the refinery's consent to the assignment of its throughput agreement. Respondent, as general counsel to the refinery, was responsible for the preparation and review of all documents connected with this transaction. As counsel to the refinery, Respondent did not provide in the purchase agreement for the elimination of the minimum guarantee at such time as the construction loan was extinguished. After the loan was retired and after the pipeline partnership had exercised its option to purchase the refined product pipeline corporation, the refinery's president told Respondent that he wanted the minimum guarantee eliminated; however, Respondent objected to the elimination of the minimum guarantee. Elimination of the minimum guarantee would have reduced the value of Respondent's family's interests in the pipeline partnership.

In 1979, the refinery wished to expand its operations and, in order to obtain the necessary financing, was told by its bank that it needed to show more assets on its financial statement. Since the refinery had loaned the terminal partnership several million dollars to facilitate the terminal's construction, which debt the terminal partnership was unable to service, the refinery's president was advised by the bank that the refinery's financing would be contingent, in part, on the transfer of the terminal partnership's assets to the refinery in order to report the terminal assets on the refinery's financial statement. Accordingly, the president asked Respondent to accomplish this transfer.

At about this time, the president learned that the terminal partnership partnership agreement required the unanimous consent of all partners for any transfer of partnership assets. When he learned that the terminal transfer required the unanimous consent of all partners, the president asked Respondent to obtain the consent for the transfer from the trustee of Respondent's trusts. Respondent demanded that the refinery pay his family trusts the sum of $300,000 in exchange for their permission to transfer the assets of the terminal partnership to the refinery. The president rejected this demand.

Over a period of time, Respondent continued to negotiate directly with his client, the refinery's president, for the transfer of the terminal partnership assets. Late in 1979, Respondent met with the president and outside counsel to discuss settlement of Respondent's demand for payments to his family trusts in exchange for the trusts' consent to the transfer. Due to pressure from the lending institutions to expedite the transfer of assets, the president agreed to Respondent's demand to pay $100,000 (a price established by outside counsel), "net of income taxes," in exchange for Respondent's agreement to allow the trustee of his family trusts to execute the necessary documents. Despite the fact that Respondent was negotiating on behalf of himself and his family and against his clients, Respondent billed the refinery for the time spent negotiating on this date.

In the summer of 1983, Respondent's son was fired from his employment at the refinery. At that time, Respondent was serving as president of a company that had been established to manage both the crude and refined pipelines (the "management company"). In September, 1983, Respondent had himself appointed chairman of the board of the management company and had his son appointed to replace him as president of the company. Respondent, while still serving as counsel to the refinery, appointed his son as president for the specific purpose of investigating several alleged "discrepancies" in financial transactions between the refinery, the management company, and a financial institution. Respondent believed these "discrepancies" had resulted in substantial gain to the refinery at the expense of the pipeline partnership.

In September, 1983, while still serving as counsel to the refinery, Respondent caused letters to be issued to the refinery's accountant and vice-president demanding that Respondent's son be given access to certain documents allegedly needed to facilitate his investigation of the alleged "discrepancies." The letter was written on management company stationery and signed by Respondent as

chairman of the board. Later, while still serving as counsel for the refinery and its president, Respondent had an associate in his law firm draft a complaint suitable for filing in a court, alleging that the refinery and its president, as trustee of the Respondent's family trusts, had misused funds belonging to the pipeline partnership and to all of the trusts. This draft complaint was then delivered to the refinery's president.

Shortly thereafter, the refinery president informed Respondent that he was going to terminate Respondent as counsel to the refinery. Respondent, in response, advised the president that in the event Respondent was terminated, he would turn over to the Internal Revenue Service a "closet full of documents" that would subject the refinery to prosecution by federal authorities. This exchange occurred during a chance meeting in a restaurant. Several days later, Respondent wrote and delivered a letter to the refinery president in which he accused the president of "criminal blackmail," "harbor[ing] a self-confessed criminal," and "knowing and consenting in advance to the perpetration of [a] crime." Three days later, in response to this letter, the refinery president issued and delivered a letter to Respondent that officially advised Respondent of his termination as counsel to the refinery. Following termination, Respondent submitted a substantial bill for services rendered but not previously billed. Respondent also caused a civil action to be filed on behalf of Respondent's family's trusts against the refinery president seeking $2,000,000 in damages.[3]

B–1

Under the *Professional Responsibility Code*, a lawyer may engage in a business transaction with a client only if the transaction satisfies standards designed to protect the client against an overreaching attorney.[4] However, a lawyer is prohibited from entering into a business transaction with a client if they have "differing interests therein," and the client "expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client consents after full disclosure." *In re Watson* (1985), Ind., 482 N.E.2d 262, 264; *In re Aspinall* (1983), Ind., 455 N.E.2d 942, 943; D.R. 5–104(A). Moreover, under D.R. 5–101(A), a lawyer is prohibited from accepting employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial or business interests unless the client consents after full disclosure. *In re Young* (1985), Ind., 482 N.E.2d 723, 723. As we observed in *In re Welke* (1984), Ind., 459 N.E.2d 725:

> The *Code of Professional Responsibility for Attorneys at Law* does not preclude an attorney from being an entrepreneur or engaging in any other lawful profession. However, it does provide that if there is a conflict between these personal interests and professional obligations, the latter must prevail. Only through adherence to these principles and enforcement of such standards can the integrity of the profession be maintained.

*Id.* at 730. Ethical Consideration 5–1 of the *Professional Responsibility Code* provided

---

3. The matter went to trial in 1986. The court found against the plaintiff on all counts, found that the action had been maintained with the bad faith direction of Respondent, and awarded defendants $670,000 as reasonable costs and attorney fees.

4. The *Professional Conduct Rules*, effective January 1, 1987, contain explicit guidance in this regard. Professional Conduct Rule 1.8(a) provides:

> A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
> (1) the transaction and terms on which the lawyer acquires the interest are fair and rea-

sonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can reasonably be understood by the client;
(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
(3) the client consents in writing thereto.

*See also* Ind.Professional Conduct Rule 1.7(b) ("A lawyer shall not represent a client if the representation of that client may be materially limited by ... the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation....").

that a lawyer should exercise professional judgment "solely for the benefit of his client and free of compromising influences and loyalties." Ethical Consideration 5–3 added that even if a lawyer's property interests "do not presently interfere with the exercise of his independent judgment, but the likelihood of interference can reasonably be foreseen ..., a lawyer should explain the situation to his client and should decline employment or withdraw unless the client consents ... after full disclosure." *See* Bruce A. Mann & Marcus P. Wilkinson, *The Role of Counsel in Venture Capital Transactions,* 46 Bus. Law. 770 (1991); Note, *Developments in the Law—Conflicts of Interest,* 94 Harv.L.Rev. 1244, 1286 (1981).

■ We find that Respondent, by negotiating and obtaining a six percent interest in the terminal partnership and the pipeline partnership for himself and his family, which partnership agreement gave his family trusts a veto power over his client's family trusts, entered into business transactions with a client having differing interests therein and one in which the client expected the Respondent to exercise his professional judgment therein for the protection of his client.

Furthermore, Respondent's interests in these arrangements and transactions differed from his client's in many respects. For example, Respondent's family's trusts benefitted to the detriment of his client's interests from the minimum payment provisions of the lease between the refinery and the pipeline partnership, from the minimum payment provisions of the throughput agreement with respect to the refined product pipeline, and from the unanimous consent provision of the terminal partnership lease. Respondent failed to inform his client as to how these interests differed from those of this client. Consequently, Respondent violated D.R. 5–104(A) of the *Professional Responsibility Code.*

■ We also find that Respondent, by representing the refinery and its president while having a direct pecuniary interest in the terminal partnership and the pipeline partnership, violated D.R. 5–101(A) of the *Professional Responsibility Code* in that he continued employment as counsel to the refinery and its president when the exercise of his professional judgment on behalf of these clients was affected by his own financial, business, property, and personal interests.

### B–2

■ Respondent, by accusing his client of criminal blackmail, implicitly threatened to present criminal charges against his client solely to obtain advantage in negotiating settlement of the $2,000,000 civil action which Respondent caused to be filed. Such threats of prosecution serve to subvert the judicial process and to diminish public confidence in our legal system. *In re Walter,* (1984), Ind., 466 N.E.2d 35. This conduct was in violation of D.R. 7–105(A) of the *Professional Responsibility Code.*

### III

### A

In 1969, Respondent began serving as general counsel for a mutual insurance company. At various times between 1973 and 1988, Respondent served as general counsel, vice-president and assistant secretary, chief administrative officer, a director, and a member of the executive committee for this company (the "mutual insurance company"), a corporation that managed the mutual insurance company (the "management company"), and a corporation that operated as a reinsurer for the mutual insurance company (the "reinsurance company"). We refer to these three entities in this opinion collectively as "the companies" and to the management company and reinsurance company collectively as "the stock companies." Respondent owned voting stock in the stock companies and was involved in the day to day business affairs of the mutual insurance company, the offices of which were next to his law offices in an office building for most of this time.

In 1985, Respondent secured a $50,000 personal loan from his client, the management company. While he did repay the loan in full and in a timely fashion, he failed to fully disclose to the executive committee of the management company the conflict of interest involved in such a business transaction between an attorney and his client, nor did

he suggest that the management company obtain advice from independent counsel before agreeing to the loan.

In January, 1988, a dispute arose between Respondent and various members of the management company's executive committee. One of these members, Mr. Hamilton, brought another attorney to a special meeting of the holders of "Class A" shares in the stock companies. The outside attorney's fee of approximately $1,500 was paid by the mutual insurance company. Some, but not all, of the Executive Committee members had authorized the payment of this fee with company funds; however, the full executive committee did not formally approve the payment of this fee until a March, 1988, meeting.

Respondent took the position that payment of this fee by the companies was improper. In fact, Respondent informed the mutual insurance company's president that the payment of the fee constituted the "criminal conversion" of the mutual company's funds for the personal benefit of Mr. Hamilton. Respondent advised the president and the president's cousin, Mr. Kirtley, both of whom owned Class A shares of the management company, that a derivative action should be filed against the companies and Mr. Hamilton in an attempt to recover the amount of the attorneys fee. Another attorney, Mr. McClellan, was retained to assist in the derivative action but, while still serving as counsel to the companies, Respondent drafted a proposed derivative action naming the president as plaintiff and Mr. Hamilton and the companies as defendants and forwarded the draft with a letter to Mr. McClellan discussing the strategy he believed should be employed by the plaintiff in the derivative action.

After meeting with Mr. McClellan and Respondent, the president decided that it would be best if someone other than he be the plaintiff in the derivative action. At this point, Mr. Kirtley agreed to be the plaintiff. Accordingly, in April, 1988, the derivative action was filed with Mr. Kirtley as the named plaintiff and Mr. Hamilton and the companies as defendants. Plaintiff requested that the trial court enjoin the stock companies from voting on a proposed amendment to their bylaws and demanded that Mr. Hamilton pay treble damages for the alleged conversion of the mutual company's funds. Mr. McClellan was listed as the sole attorney for Mr. Kirtley. Despite Mr. Kirtley's consent to act as plaintiff, he admitted he was merely a "front-man" for the Respondent and the president.

Several days later, Respondent was terminated as counsel to the companies and the president was removed from office. The next day, Respondent formally entered his appearance on behalf of Kirtley in the derivative action against his former clients and Mr. Hamilton. Respondent also submitted a substantial bill for services rendered but not previously billed.

Eventually, Mr. McClellan and the attorney for the defendants in the derivative action entered into settlement negotiations. The hearing officer found that Respondent was opposed to settlement of the case for two reasons. First, settlement of the derivative action would destroy what Respondent himself wanted primarily to accomplish by this action, which was to intimidate Mr. Hamilton into resigning from the executive committee and surrendering his Class A Shares. If Mr. Hamilton were to resign, Respondent believed that he and the president could regain control of the companies. Second, Respondent believed that settlement of the derivative action would adversely affect his own personal claim that the companies owed him approximately $910,000 in legal fees, which claim was pending in another court. Respondent was convinced that Mr. Hamilton would surrender his shares if Mr. Kirtley vigorously pursued the derivative action. With Mr. Hamilton removed and Respondent's faction back in control of the companies, Respondent believed that it would facilitate a favorable settlement of his claim for unpaid fees.

After learning of Respondent's opposition to settlement, Mr. McClellan realized that Respondent's personal interest in the litigation prevented him from evaluating objectively the merits of the derivative action. Mr. McClellan excluded Respondent from further settlement negotiations.

In October, 1988, Mr. McClellan advised counsel for the companies of a settlement proposal Mr. Kirtley had approved. Those terms were accepted by the companies. The court was apprised of the proposed settlement and, pursuant to the Indiana Trial Rules, the court ordered that the terms of the settlement be published in regional newspapers for the review of other shareholders. In addition, the Court ordered that a hearing be scheduled for the express purpose of allowing those shareholders who objected to the terms of the settlement to appear. Neither Mr. McClellan nor Mr. Kirtley appeared at the hearing. However, Respondent appeared and filed an objection to the settlement, purportedly on behalf of Mr. Kirtley. This objection was filed without Mr. Kirtley's approval or authorization. By Respondent's own admission, he did not consult Mr. Kirtley about filing the objections and did not even review the terms of the settlement prior to filing the objection.

The next day Mr. Kirtley filed an affidavit with the Court in which he indicated that Respondent "does not represent the Plaintiff [Mr. Kirtley] and has no standing to file an Objection to the Purported Settlement heretofore reached in this case." Shortly thereafter, Respondent filed an formal petition to withdraw his appearance on behalf of Mr. Kirtley. This motion was later granted. In January, 1989, Respondent filed a new written objection to the settlement on behalf of himself, the former president, and two others. After a hearing, the Court approved the parties' settlement agreement and found that neither Respondent nor the three other individuals adequately represented the interests of the shareholders.

**5.** For Prof.Cond.R. 1.7(a), see note 3, *supra*. Rule 1.7(b) provides:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) the lawyer reasonably believes the representation will not be adversely affected; and
(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

### B–1

As discussed in part II–B–1 *supra*, a lawyer was required to satisfy the provisions of the *Professional Responsibility Code* when entering into any business transaction with a client. This includes borrowing from a client. *In re Welke*, 459 N.E.2d at 729. Respondent, by negotiating a $50,000 personal loan from his client in 1985 without fully disclosing the inherent conflict of interest involved, violated D.R. 5–104(A) of the *Professional Responsibility Code*.

### B–2

The Commission contends, and the hearing officer found, that Respondent had engaged in impermissible conflicts of interest in two respects in connection with the derivative suit against the stock companies. First, Respondent is charged with violating Prof. Cond.R. 1.7(a) and (b)[5] by preparing a complaint for the then-president against the companies while serving as general counsel to the companies and in an effort to advance his own interests engaged in an impermissible conflict of interest. Second, Respondent is charged with violating Prof.Cond.R. 1.9[6] by entering his appearance on behalf of Mr. Kirtley in the derivative action and against the companies on the day following his termination as general counsel to the companies.

Each of the three companies was clearly Respondent's client. We also conclude that the derivative action individual plaintiff, Mr. Kirtley, was Respondent's client at least from the point that Respondent began to collaborate with the president and Mr. Kirtley on strategy for the derivative action. We

**6.** Prof.Cond.R. 1.9 provides:

A lawyer who has formerly represented a client in a matter shall not thereafter:
(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 [governing confidentiality of client information] would permit with respect to a client or when the information becomes generally known.

believe the question of whether Respondent is guilty of this misconduct turns on (i) whether Respondent's representation of both the derivative action shareholder plaintiff and of the companies constituted representation of one client "directly adverse to another client" and, therefore, violated Prof.Cond.R. 1.7(a), and (ii) whether Respondent's representation of both the derivative action shareholder plaintiff and the companies under these circumstances constituted representation of a client that might have been "materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests" and, therefore, violated Prof.Cond.R. 1.7(b). If the answer to these inquiries is in the affirmative, we believe it is clear that Respondent has violated Prof.Cond.R. 1.9 as well.

■ Under Indiana law, the shareholders of a corporation may bring suit to compel the directors to perform their legal obligations in the supervision of the corporation. Ind.Code §§ 23–1–32–1 through 5 (1993). Such a proceeding is brought "in the right of the corporation" by a qualified shareholder. Ind.Code § 23–1–32–1. The corporation, then, is nominally the plaintiff in the action. Because a derivative action is brought *on behalf of* the corporation, can it be that the interests of the derivative action individual plaintiffs are adverse to those of the corporation on whose behalf they are acting? And if these actions are not adverse, can it be a conflict of interest for the same lawyer to represent both the individual plaintiffs and the corporation? [7]

While we can envision some circumstances where a conflict would not be found to exist,[8] we believe an impermissible conflict of interest occurred here. While a derivative action is brought nominally by the corporation, it usually represents a legal controversy over management of the organization. Comment to Prof.Cond.R. 1.13. In fact, at issue here was a battle for corporate control between two factions of holders of Class A shares of the stock companies. Notwithstanding the procedural structure of derivative litigation, it is an adversarial proceeding between incumbent management and dissident shareholders. To have one side in the battle as a client is to be directly adverse to the other side.

■ Furthermore, as general counsel to a corporation involved in a derivative action, a lawyer will be responsible for at least initial advice to the board of directors on alternative responses to the litigation. In this regard, we note that under the Indiana Business Corporation Law, a procedure exists that permits a committee of "disinterested directors or other disinterested persons" appointed by the board of directors to terminate derivative actions against the corporation. Ind.Code § 23–1–32–4. While any such committee would likely retain separate counsel, it is also likely that corporate counsel would have a duty to advise the board of this legal alternative when the litigation is filed. Clearly, a lawyer involved in advising the board of directors on terminating such litigation would have a direct conflict of interest if also involved in bringing the lawsuit itself.

Finally, we conclude that Respondent's principal motivation in furthering the derivative action was self-interest—restoring those individuals friendly to himself to power to his economic benefit.

■ Respondent, by preparing a complaint for the then-president against the companies while serving as general counsel to the companies and in an effort to advance his own interests engaged in an impermissible conflict of interest in violation of Prof. Cond.R. 1.7(a) and (b).

■ Respondent violated Prof.Cond.R. 1.9(a) by entering his appearance on behalf of Mr. Kirtley in the derivative action and

7. The obverse of the question presented here, namely whether a corporation's counsel may defend directors of a corporation in a derivative action is a much discussed topic and the subject of frequent litigation. See Comment to Prof. Cond.R. 1.13 (derivative actions); Robert J. Landry, III, *Joint Representation of a Corporation and Director/Officer Defendants in Stockholder Deriva-* tive Suit: *Is It Permissible?*, 18 J.Legal Prof. 365 (1993).

8. *See, e.g., Seifert v. Dumatic Indus., Inc.,* 413 Pa. 395, 197 A.2d 454 (1964) (corporate general counsel permitted to bring derivative action on behalf of one of two fifty percent shareholders).

against the companies on the day following his termination as general counsel to the companies.

### B–3

█ Professional Conduct Rule 3.3(a)(1) prohibits a lawyer from "knowingly ... mak[ing] a false statement of material fact or law to a tribunal." Professional Conduct Rule 8.4(d) prohibits a lawyer from engaging in conduct that is "prejudicial to the administration of justice." Respondent, by representing to the court in the derivative action that he had authority to file an objection to the settlement on behalf of Mr. Kirtley when, in fact, he did not have such authority, violated Prof.Cond.R. 3.3(a)(1) and Prof.Cond.R. 8.4(d).

### IV

### A

The hearing officer found by clear and convincing evidence that the acts of Respondent as they relate to Count I constitute violations of the *Professional Responsibility Code* and that the acts of Respondent as they relate to Count II constitute violations both of the *Professional Conduct Rules* and of the *Professional Responsibility Code.* The hearing officer also asked that we consider certain aggravating circumstances, including the following:

1. Respondent previously received a private reprimand by this court in 1981 for engaging in an impermissible conflict of interest. *In Re Strutz,* Cause No. 179S14.

2. Respondent directly negotiated with the refinery, his client, for the consent to transfer the terminal partnership assets to the refinery.

3. Respondent billed the refinery for the time spent negotiating the amount of money to be paid to his family trusts by the refinery in exchange for the consent to transfer the terminal assets.

4. Respondent consented to, encouraged and participated in the September, 1983, investigation by his son of an alleged wrongdoing by the refinery president and refinery at a time when he was still serving as counsel to the president and refinery.

5. Respondent impliedly threatened to turn over to the Internal Revenue Service certain documents belonging to his client, the refinery president.

6. Respondent refused to acknowledge the wrongful nature of his conduct both as to Count I and Count II.

7. Respondent has substantial experience in the practice of law.

8. In each of the two instances presented in this action, when Respondent's services were terminated less than amicably, Respondent submitted substantial billings to his former clients for unbilled services.

9. Respondent used Mr. Kirtley's friendship to advance Respondent's personal interests through the derivative suit.

The hearing officer also found the following mitigating circumstances which he asked that we consider:

1. Respondent, for many years, performed good and valuable services for his clients, the refinery, its president, and the companies.

2. Respondent has, at no charge, used his professional skills to assist worthy individuals who otherwise might not have been able to afford the assistance of counsel.

3. Respondent is active in and supportive of his church.

4. Respondent's current practice is primarily limited to charitable work.

### B

█ In imposing a sanction after a finding of lawyer misconduct, we consider (a) the duty violated, (b) the lawyer's mental state, (c) the actual or potential injury caused by the lawyer's misconduct, and (d) the existence of aggravating or mitigating factors. *In re LaCava* (1993), Ind., 615 N.E.2d 93, 96. By violating D.R. 5–101(A), D.R. 5–104(A), *Professional Conduct Rules* 1.7(a) and (b) and 1.9, Respondent engaged in violations of duties owed to clients. By violating D.R. 7–105(A) and *Professional Conduct Rules* 3.3(a)(1) and 8.4(d), Respondent engaged in violations of duties owed to the legal system. We find that Respondent engaged in each of these violations intentionally or knowingly.

While actual financial loss to Respondent's clients does not appear to be extensive, we do not minimize the time and effort that each had to expend to deal with Respondent's unethical behavior. The court in the derivative action was also subjected to delay and unnecessary effort as a result of Respondent's unethical conduct. We find that the Respondent's misconduct resulted in actual injury to both his clients and the court. Finally, in accordance with the hearing officer's findings, we conclude that there are aggravating circumstances here that substantially outweigh mitigating circumstances.

Based upon the foregoing, we conclude that Respondent should be suspended from the practice of law for a minimum period of two years, effective July 24, 1995. In assessing this sanction, we have reduced the sanction somewhat from what otherwise would have been warranted in deference to Respondent's age and the length of time this proceeding has been pending. Costs are assessed against Respondent.